MATTHEW PEARL SLOAN, Appellant, v. THE AMERICAN PRESS, I. M. LEVITT and IDA LEVITT.—37 S. W. (2d) 884.

Division One, March 31, 1931.

*Ernest A. Green* and *Oliver T. Remmers* for appellant.

*Buder & Buder* and *G. A. Buder, Jr.,* for respondent, The American Press.

*Jones, Hocker, Sullivan & Angert* for respondents I. M. Levitt and Ida Levitt.

*Judson, Green, Henry & Remmers* for appellant in reply.

ELLISON, C.—The plaintiff was injured by falling into an open elevator shaft located in the areaway under a sidewalk in St. Louis. He sued the corporate lessee and the individual owners of the abutting property upon which is situate the Times Building, and recovered a verdict for $15,287 damages. From the order of the circuit court setting aside that verdict and granting the defendants a new trial he has appealed.

On a former trial a verdict for appellant was set aside as being against the weight of the evidence (and for other reasons). The same judge presided at both trials. The stated ground upon which the verdict in the last trial was overturned is that prejudicial error was committed in the denial of the separate demurrers of the several respondents offered at the close of the appellant's case and at the close of the whole case, because appellant's conduct on his own showing convicted him of contributory negligence under the law as declared in Ryan v. Kansas City, 232 Mo. 471, Smith v. Kansas City, 184 S. W. 82, and other cases. These two decisions were cited by the

circuit court in its memorandum opinion sustaining the respondents' motions for a new trial.

No issue is made on the pleadings. They sufficiently raised the issue of common-law and ordinance negligence on the part of the respondents in failing to guard the elevator shaft properly; and contributory negligence on the part of the appellant in failing to pay any attention to where he was going and in falling into the hole. The sole question to be determined on this appeal is whether the trial court was correct in holding the appellant guilty of contributory negligence as a matter of law on the undisputed facts. This, necessitates a rather full review of the evidence. In doing so we shall set out much of the testimony stressed by appellant in his brief.

The Times Building is located at the northeast corner of the intersection of Chestnut Street and Fifth Street or Broadway as it is called. Chestnut is an east-and-west street and Broadway runs north and south. The sidewalk in question is on the north side of Chestnut Street and extends flush up to the building. Underneath is an areaway which forms a part of the basement. The elevator is a platform hoist running from the areaway up through the sidewalk, and is used mainly for lowering print paper to the basement. The rectangular opening therefor in the sidewalk is about 64 or 74 inches long east and west by 40 or 50 inches wide. When the elevator is not in use the opening is covered by a pair of iron doors which operate on hinges and close together horizontally, forming a part of the sidewalk. When the elevator is in use the doors swing upward on their hinges and are securely fastened so they stand perpendicular to the sidewalk and serve as guards or barriers some 20 to 24 inches high, on the north and south sides of the opening. While in this position they engage with or are fastened to reinforced iron-mesh screens 3½ feet high on the east and west sides of the hole. Thus the screens confront or oppose the current of pedestrian traffic normally moving lengthwise along the sidewalk eastward and westward.

Plaintiff, aged 33 years, met with his misadventure in mid-afternoon of June 2, 1924, a clear sunshiny summer day—while proceeding west along the sidewalk with a companion named Murphy. They had come from the Pierce Building in the next block east. The place of the accident and the surroundings on that side of Chestnut between Fourth Street and Broadway are portrayed by Exhibits 1 and 2 shown herewith, which are photographs taken within fifteen to twenty minutes after the accident and exhibiting the same conditions as at the time thereof, save that the elevator platform is shown, whereas at the time of the accident it was at or near the

bottom of the shaft. Exhibit 1 shows the view looking west, the direction in which plaintiff was travelling, while the view in Exhibit 2 is to the east and shows the way over which he approached.

EXHIBIT I.

The plaintiff had no previous knowledge of the sidewalk, as the occasion was his first visit to St. Louis. After a night's travel without sleep he had arrived around noon with the Wortham Show, for which he operated a concession. Upon arrival he and Murphy, also connected with the show, went sight-seeing within a short radius of the hotel they had chosen on arrival and to which they were returning when the accident occurred.

In the interval they had had lunch, and, as they testified, two glasses of beer. Each declared both were sober. This was supported to some extent by another witness. On the other hand the record of the hospital to which plaintiff was taken immediately upon the

injury recites that he was suffering from acute alcoholism and the recital finds support in the testimony of some six or eight witnesses for defendants—including police officers, chauffeurs, a barber, a manicurist and other persons—some of whom came in contact with plaintiff in the interval mentioned and said he appeared to be drink-

EXHIBIT II.

ing and "staggery." Others of these witnesses said his breath "smelled strong of liquor." But be that as it may, plaintiff's version of his condition will be accepted in considering the question of his contributory negligence.

The appellant gave the following testimony.

### Direct Examination

"Q. Now, then, Mr. Sloan, turn around and tell these gentlemen in your own language how the accident occurred and all about it—

just what happened and all that you know about the matter? A. Well, Murphy and I were walking along in the general direction of the hotel and he had been in the city here before and was somewhat familiar with it and we hiked back towards the hotel and, as I remember it, I stopped to light a cigarette and he proceeded a little ahead of me and as I kind of turned my head to the left, glancing across the street and proceeding ahead, my attention was momentarily attracted by a person coming on the opposite side of the street.

"Q. The south side of the street? A. Yes, sir; the south side." (Objection and discussion.)

"Q. Were you on the regular sidewalk? A. Yes, sir; where the rest of the pedestrians were walking, and I proceeded in this direction and this other man looked like—he was dressed and about the size of the superintendent of concessions, Ralph Ray, the man I work for. I walked in this manner, turning my head, wondering what he was doing downtown; I figured he would be at the show ground and as I walked ahead ten or fifteen or twenty steps and was still looking at him, glancing across the street, my legs came into contact with something and I had a sense of falling; that is all. That is all I remember for weeks, when I came to.

"Q. Your legs came into contact with something and you had a sense of falling? A. Yes, sir.

"Q. Do you know what you came into contact with? A. I saw it afterwards; it was that door.

"Q. When did you see it? A. Since—after I got out of the hospital." (Objection and discussion.)

"Q. You didn't see it at that time? A. No, sir; my attention was momentarily attracted to this man.

"Q. What part of your body did this come into contact with? A. In the neighborhood of my knees.

"Q. Did you feel it against your knees? A. I bumped into it.

"Q. Then what occurred? A. It threw me off of balance and I toppled over."

(Appellant's testimony here turns to the nature of his injuries, the treatment thereof, and the expense incurred therefor.)

### Cross-Examination

Appellant first described his movements in St. Louis between noon and mid-afternoon when the accident occurred.

"Q. And you say the first thing you knew was that after lighting that cigarette and looking across the street you walked, you say, in your direct testimony, ten, fifteen or twenty steps? A. I went ahead with my head turned to the left, proceeding ahead a few feet.

"Q. You said on your direct examination—you said ten, fifteen or twenty steps? A. Possibly that far; I don't know.

"Q. How much ground did you cover on a step? A. About the average man of my build. I guess maybe three feet or two foot and a half.

"Q. About three feet; you then walked somewhere between thirty and sixty feet; is that right? A. Yes, sir.

"Q. Now, during the time you walked that thirty or sixty feet did you look where you were going or keep on looking across the street? A. My attention, I said, as about seeing Ray over there, and I was proceeding ahead holding my head that way (indicating) and was turned around as I went ahead and that is all I know and I collided with something; I was a pedestrian on the sidewalk and I thought was naturally safe. I didn't look for no obstructions.

"Q. Do you usually walk along the sidewalk without looking where you are going? A. I walk along as the average man.

"Q. You didn't look ahead in this instance, did you? A. Possibly I did; there might have been a pedestrian between me and the obstruction.

"Q. I say, did you or did you not? A. I used the average caution a man does, I guess.

"Q. Well, did you look ahead or did you keep looking across the street from the time you walked that thirty to sixty feet? A. After my attention was called to him, I didn't look ahead again until I toppled over and collided with this obstruction, this door.''

Appellant was then questioned further about his manner of walking along the sidewalk, his conversation with Murphy, and about seeing the man he thought was Ray. He said he didn't remember what kind of a sidewalk it was, or whether he crossed any alleys, or whether there were any cobblestones. He didn't remember the width of the sidewalk or how close he was to the abutting buildings, though he remembered there were buildings there. He judged Ray was just about even with him on the opposite side of the street when he first saw him. These questions were then asked him and he gave these answers.

"Q. Well, did you have to keep your eyes glued on him while you walked that thirty or sixty feet? A. Maybe I didn't walk that far. I only took a few steps, possibly ten, twelve or fifteen; I don't know how far; there might have been five steps; I didn't pay no attention.

"Q. But you are positive that you kept on looking at him? A. Yes, I had my head turned, otherwise I would have seen that obstruction and avoided it; I would have seen that hole and not went into it.

"Q. Did you keep walking straight ahead or turn to the right or left while looking at him? A. I can't tell; I guess I was still on the sidewalk.

"Q. Do you know whether you were still on the sidewalk? A. Certainly I was. I would have felt myself if I stepped down off of the curb, wouldn't I?

"Q. You didn't feel yourself crossing any cobblestones, did you? A. I have no recollection, no.

"Q. You don't know anything about that? A. No, sir."

He further explained that just before he saw Ray he had stopped to light a cigarette "a few feet from the hole I fell in." His companion Murphy proceeded on ahead. After the appellant lit the cigarette he glanced across the street and saw the man he thought was Ray. The appellant continued to look sidewise at the supposed man Ray, who was going east on the south side of the street while appellant was walking west on the north side of the street. In the meantime Murphy had got four or five steps ahead, he estimated, but immediately afterwards said "he couldn't have been very far ahead of me—a few feet, I guess—it all happened so quick, I don't know." And then he added that he didn't see Murphy from the time Murphy left him until he fell in the hole, because he was looking across the street.

On cross-examination by counsel for another respondent the appellant said again he saw Ray about opposite him on the south side of the street and thence proceeded looking sidewise at Ray until he fell into the hole. Being asked how far he was from the point where he fell when he first saw Ray he answered: "A few steps, five or ten; I don't know; it might have been more or less; I don't know." A little later the question to him was: "How long would you say you continued looking at him (Ray)?" And his answer was: "I couldn't state for sure, a few steps, maybe five or ten, more or less; it might have been less." And still a little later the following questions and answers appear:

"Q. How long would you say you continued looking at him? A. I couldn't state for sure, a few steps, maybe five or ten, more or less; it might have been less.

"Q. Where was he when you last noticed him? A. I don't know; he was still in my range of vision. I kept my eyes on him wondering what he was doing downtown.

"Q. How many steps had he taken from the time you first saw him until you saw him last? A. Five or ten or fifteen; he didn't seem to be in a hurry.

"Q. And in order for you to observe his movements and his steps you had to turn your head in passing, turn your body to continue to observe him; is that correct? A. Yes, sir.

"Q. And during that period of time you continued to walk wes'wardly on this sidewalk? A. I proceeded ahead on this sidewalk; yes, sir.

"Q. Now, while you were walking in that manner did you change your course by turning either to the left or to the right? A. I must have done that, otherwise I wouldn't have fell into the hole.

"Q. Do you know there is an entrance to an alley paved with cobblestones immediately east of this hole in which you fell? A. I know that now.

"Q. And would you say when you first started to observe this man walking eastward you had reached that entrance to that alley or just where were you with reference to the entrance to the alley? A. Well, from what I have seen since, I determined that I passed the alley. I evidently must have passed the alley, if my recollection is right. I don't think that hole is, maybe, forty or fifty feet; I never measured it; just my recollection; and I was pretty close to it when I first glanced over and seen Ray, but I have no recollection of passing the alley at the time of the accident. It is something that is a trivial thing that wouldn't call a man's attention. I have passed thousands of alleys.

"Q. There are two alleys there, are there not? A. I have no recollection of that.

"Q. You know that now from going over the scene of the accident; you know there are two alleys? A. I know there is one with cobblestones; I don't know whether there are two or not.

"Q. Where was it with reference to these two alleys that you first started to light your cigarette? A. Just a few feet from the hole.

"Q. How far would you say? A. A few steps, five or ten."

Appellant's companion and witness, Murphy, stated on direct examination that as he and the appellant were walking along the north side of Chestnut Street: "I got a little ahead. Sloan says, 'There is somebody I want to see,' or something to that effect, and I walked a little ahead and I don't know, just a moment somebody cried out, and I looked around and I didn't see Sloan and I walked back and looked down the elevator and he was laying down there."

On cross-examination he said he began walking ahead of the appellant "a few steps" before they got to the elevator shaft, when the appellant started to light a cigarette. Being pressed for a more specific answer as to the distance he estimated eight or ten steps. He changed that answer and said he meant "I was that far ahead of him." Then he said he got approximately six or eight steps past the hole when he found out something had happened to the appellant. He was then asked just where the appellant was when he stopped to light the cigarette, and answered, "I don't know; he must have been around even with that elevator, the end of the elevator; in a few feet of it, anyway." Still later he said the appellant was "around

about the alley" when he started to roll the cigarette. We do not find that the record gives the width of the alley or the distance therefrom to the elevator shaft, by actual measurement. The two pictures, however, show both.

There is considerable evidence for respondents covering the movements of appellant and Murphy immediately preceding the accident, how far they were east of the elevator when Murphy started to walk ahead, their condition of intoxication, and so on, but we omit it from this statement as we are dealing with a demurrer to appellant's evidence. This much can be said, however: that the evidence for respondents does not help the appellant's case in any wise.

I. The appellant insists he made a case for the jury because it is shown without dispute that he was unacquainted with his surroundings and ignorant of the presence of the elevator opening in the sidewalk. In these circumstances, it is argued, he was entitled to "presume" the way was clear and safe, and was not guilty of contributory negligence in walking as he did for some distance, with his eyes, face, and perhaps even his body turned partly southward while he watched the man on the other side of the street he thought was Ralph Ray—with the result that he did not see the plainly visible open shaft and barriers, and diverged from a straight course so much as to fall over the iron door on the north side thereof instead of running against the waist-high metal screen on the east side—or else missing the obstruction altogether—as he would have done had he kept going directly west. Some sixteen Missouri decisions are cited by appellants, and several from other states. It will be impossible to review all of them, but we shall refer to the ones thought to be most nearly in point.

The circuit court ruled the case on authority of Ryan v. Kansas City, 232 Mo. 471, 134 S. W. 566, and Smith v. Kansas City, 184 S. W. 82, both Banc cases. Appellant says the latter is in his favor and overrules the former. Preliminary to a discussion of what they hold we shall consider that point.

The principal opinion in the Ryan case was written by GRAVES, J., and had the full concurrence of FERRISS, J. LAMM, J., concurred in a separate and more restrictive opinion, and BROWN, J., in the result. VALLIANT, C. J., was absent. WOODSON and KENNISH, JJ., dissented in a vigorous opinion by the latter. Granting the separate opinion of Judge LAMM (which the circuit court followed in the instant case) had the concurrence of Judge GRAVES and FERRISS, on the theory *major continet in se minus*, yet even then it is not controlling authority because it expressed the concrete views of only three of the six judges who sat in the case. One of the other three concurred in the result alone and two dissented.

But it is equally true that the Smith case cannot be considered a ruling decision overthrowing the Ryan case for whatever it is worth as authority. For, while the principal opinion, by WOODSON, J., sets out *in toto* and adopts the dissenting opinion of Judge KENNISH in the Ryan case, yet the three judges who joined with him concurred in the result only. The other three judges either dissented or were absent. Nevertheless, both the Ryan and Smith cases have been cited and followed more than once since, and it is necessary and profitable to note the facts and rulings therein. The question under consideration, it will be remembered, is what degree of vigilance, if any, a pedestrian must exercise in watching for obvious defects or obstructions when walking along a sidewalk with which he is unfamiliar.

In the Ryan case the plaintiff, a woman, was walking along the sidewalk in Kansas City at night and fell into a hole or space about 1½ feet deep which had been excavated for a new sidewalk. It was dark and raining and the hole had been filled with water, but there were street lights in the neighborhood which the defendant city claimed would have enabled her to discover the pitfall if she had used due care, and the defense of contributory negligence was accordingly interposed. Embodying that theory the trial court gave an instruction for the defendant telling the jury if the light from the street lamps was sufficient to illumine the place "so that plaintiff by the exercise of ordinary care and the use of her eyes and other senses ought to have known of the excavation" and to have avoided the same, then their verdict should be for the defendant. On appeal the plaintiff complained of this instruction.

The principal opinion, by Judge GRAVES, held the instruction good on authority of Woodson v. Met. St. Ry. Co., 224 Mo. 685, 123 S. W. 820, 30 L. R. A. (N. S.) 931, 20 Ann. Cas. 1039; Coffey v. Carthage, 186 Mo. 573, 85 S. W. 532; Kaiser v. St. Louis, 185 Mo. 366, 84 S. W. 19; Wheat v. St. Louis, 179 Mo. 572, 78 S. W. 790, 64 L. R. A. 292; and in quoting from these decisions three times set out the statement appearing first in the Wheat case that "the citizen owes the city the duty to use his God-given senses, and not to run into obstructions that he is familiar with *or which by the exercise of ordinary care he could discover and easily avoid."*

In his separate concurring opinion Judge LAMM said: "While a footman may presume a city has done its duty in keeping its sidewalks in a reasonably safe condition for travel by pedestrians, by night as well as by day, yet that presumption runs with a condition. It goes hand in hand with another vital proposition, viz., that a footman must use ordinary, that is, due care to avoid injuring himself. Such care is the care of an ordinary person under like circumstances. Such care is broad enough to create the duty to look and see where one is going as well as the duty to avoid danger when actually dis-

covered. That does not mean a pedestrian is an *inspector* of sidewalks or cannot take a step without looking down to see that his feet do not carry him into a pit, . . . He need not be watching at every footfall for defects, but he should act like a prudent person, who makes reasonable use of his eyes while walking. He cannot shut his eyes, or blindfold himself, or walk backward, or not look about him at all, or, under the assumption no defects exist, walk heedlessly into obvious ones."

The dissenting opinion of Judge KENNISH distinguished or criticized the cases cited in the GRAVES opinion and upheld the doctrine announced in Heberling v. Warrensburg, 204 Mo. 604, 103 S. W. 36, that "it is not the duty of a person traveling on a public street to examine the street for defects, but he may act upon the presumption that it is reasonably safe so long as he conducts himself as a reasonably prudent person would do under like circumstances." But the learned jurist went on to say: "It was not held in the Heberling case, nor is it now claimed to be the law, that a footman may go along the sidewalk carelessly, paying no attention to where he is walking, so that he would fail to see plain and obvious obstructions;" and quoted approvingly the following from Earl v. Cedar Rapids, 126 Iowa, 361, 102 N. W. 140, 106 Am. St. 361: "Of course, one cannot close his eyes and walk blindly and heedlessly into a place of danger. On the other hand, he is not bound to be on the lookout for hidden dangers. All that is required of him is that he walk with his eyes open, observing his general course, and in the usual manner."

The Smith case, like the Ryan case, was one where the plaintiff stepped into a hole or depression in a sidewalk that was not an obvious and glaring obstruction. It was about six inches deep, sloping from sides to center, and had been caused by the sinking or wearing away of the sidewalk from use. The decision adds little to the extended discussion appearing in the three opinions in the Ryan case.

In Hebenheimer v. St. Louis, 269 Mo. 92, 101, 189 S. W. 1180, 1182, the plaintiff stepped upon the cover of a coal hole in the sidewalk, which tilted and caused her to fall into the opening. The defect was not obvious, in fact the defendant city contended it was latent and that its officers were not chargeable with notice thereof. This court in considering a charge of contributory negligence again said, quoting from the Iowa decision of Earl v. Cedar Rapids, supra, all that was required of the plaintiff was that she "walk with (her) eyes open, observing (her) general course, and in the usual manner."

In O'Neill v. St. Louis, 292 Mo. 656, 663, 239 S. W. 94, 96, the plaintiff stepped into an open water-service box in the sidewalk, fell, and was injured. The top had been off for some time and she knew it. What the court says about the rule applicable to pedestrians injured by an obstruction of which they had no previous knowledge

is therefore probably *obiter dictum,* but nevertheless the Ryan and Smith cases are adverted to and the weight of authority is declared to be in harmony with the Ryan case insofar as the two differ.

In Megson v. St. Louis, 264 S. W. 15, a pedestrian stepped upon the glass and concrete covering of a vault under the sidewalk. It collapsed and he fell into the cellar. The cover was worn and cracked and the iron frame thereof rusty and corroded. The plaintiff had used the walk frequently and observed these conditions, at least casually. In an opinion by RAILEY, C., Division Two of this court held the plaintiff guilty of contributory negligence as a matter of law, quoting copiously from the O'Neill case, supra, including the part which referred approvingly to the Ryan case. One of the judges dissented and the cause was transferred to Court en Banc. There is an opinion by WOODSON, J., concurred in by all the judges except WALKER, J., who dissented, a contrary conclusion was reached, the court holding the dangerous condition of the covering was not sufficiently obvious and glaring to convict the plaintiff of contributory negligence as a matter of law, even though he had seen it. The Banc opinion, however, does not refer to the O'Neill and Ryan cases.

In Hanke v. St. Louis, 272 S. W. 933, 937, the plaintiff stepped upon a portion or slab of a sidewalk which was two or three inches lower than the part on either side. The evidence did not clearly show whether she had previous knowledge of the defect. She had been along that way once or twice before, but testified she did not notice the depression on the occasion when she was injured; that the whole walk seemed to be of the same material and appearance. Citing nearly all the decisions reviewed in the preceding paragraphs, including the Ryan and Smith cases, this court said: "Cities are not insurers of the safety of persons traveling upon their sidewalks; and such persons must use ordinary care to discover and avoid obstructions or defects, or, if obstructions and defects are known to them, use reasonable care to avoid them."

Without going further, it is evident that all the cases, even the dissenting opinion in the Ryan case, require a pedestrian to have some concern for his own safety in walking on a public sidewalk though he may be innocent of knowledge that there are defects or obstructions along the way. He does not have to be constantly on the alert for defects not plainly observable, but neither may he go along paying no attention to where he is walking so that he would fail to see and avoid obvious obstructions. He must proceed as a reasonably prudent footman would do, with his eyes open and having regard for his general course.

II. But granting that this is so, the appellant argues there is another line of cases that ought to be controlling. These are deci-

sions · dealing with situations where the pedestrian's attitude was momentarily diverted by some collateral event or occurence—as here by the appellant's seeing and watching a man passing on the other side of the street whom he thought was Ralph Ray.

Thus, in Coffey v. Carthage, supra, 186 Mo. 573, 584, 85 S. W. 532, 534-5, a woman walking along a flagstone pavement stepped into a hole at the edge thereof where the stone had been cut out for a water-service box, the wooden box having rotted away. She looked across the street diagonally and saw a man approaching whom she supposed to be a tramp. She was frightened and, still watching him, checked her speed in order that they might not meet. While thus occupied she stepped into the hole. This court said if "by reason of her carelessness and negligence, in paying no attention to where she was walking," she failed to discover the hole and stepped into it, she was not entitled to recover; but further said that "it may also be true that by the exercise of ordinary care and the absence of any carelessness or negligence, the defect or hole in the walk could not have been discovered." Being unable to say as a matter of law the defect was sufficiently obvious to have challenged the plaintiff's attention if she had used due care, the court reversed and remanded the cause for error in the instructions instead of reversing outright. That is our understanding of the decision.

In Brown v. S. W. Bell Telephone Co., 274 S. W. 876, the plaintiff, a man 68 years old, was trying to head off a calf running in an alley at one side of which the defendant Telephone Company had left a hole about eighteen inches in diameter near one of its telephone poles. The plaintiff had known for several weeks the hole was there, but in concentrating on his effort to stop the calf forgot it and stepped into the opening. The Springfield Court of Appeals, citing a number of cases from other jurisdictions and few from this, held his momentary forgetfulness in the circumstances did not convict him of contributory negligence as a matter of law, but reversed and remanded the cause for error in the instructions.

In O'Donnell v. City of Hannibal, 144 Mo. App. 155, 159, 128 S. W. 819, the plaintiff, a woman 65 years old, was walking along a street she seldom travelled, about nine o'clock at night with her granddaughter. The latter was a few steps ahead. The plaintiff was not inattentive to the sidewalk, but they were conversing. There were no street lights. The moon was low in the west and the sidewalk lay in the shadow of buildings, but the light was sufficient to enable a reasonable prudent and observant person to tell whether the way was obstructed by objects of any magnitude. While thus proceeding the grandmother tripped on the hinge of a cellar door in the sidewalk, fell forward and was injured. The Kansas City Court of Appeals ruled she was not guilty of contributory negligence

as a matter of law, saying: "The evidence of plaintiff shows that she bestowed reasonable attention to her way. She was not required to give the sidewalk her undivided attention, but she might rely to some extent on the presumption that it was free of snares and pit-falls . . . Pedestrians of all degrees of care suffer their thoughts and senses to be engaged by other things than the sidewalk in front of them, and it is not contributory negligence *per se* for a pedestrian to stump his toe against a protruding gas pipe, hinge, or similar obstruction, though it be in plain sight."

In Alexander v. St. Joseph, 170 Mo. App. 376, 378, 156 S. W. 729, a woman 65 years old stumbled over a stump of a tree five or six inches in diameter which projected three or four inches through and above a brick sidewalk. At the time she was watching a fright-ened team which seemed likely to run away in her direction, and her attention was momentarily diverted from her course. The Kansas City Court of Appeals said: "It is not contributory negligence as a matter of law for a pedestrian to trip against an obstruction even though it is in plain sight, unless it was so obvious as that it could not possibly . . . escape notice if one were using the ordinary senses." [Citing the O'Donnell case last above.] The court also cites and stresses the Coffey-Carthage case, supra, where the plain-tiff was *frightened* by seeing a tramp approaching.

Appellants say Powers v. Penn. Mut. Life Ins. Co., 91 Mo. App. 55, is almost a "gray mule" case. There, a stairway led at right angles from a public sidewalk into the basement of an abutting building. The stairs projected out about three feet into the sidewalk and there were railings on the two sides thereof, but the front or entrance to the steps was unguarded. One night a crowd was gathered about the building getting election returns from a news-paper office inside, bulletins being posted in the windows. The plain-tiff came by and took a position in front of the steps. He was familiar with the locality, but did not know of the stairway. Light shown through the windows and there was an electric street lamp some seventy feet distant, but because of the crowd, the relative location of the sources of illumination and intervening objects which cast shadows, both the steps and the entrance thereto were left in dark-ness. After standing about five minutes the plaintiff started to leave. In the very act of turning from his position facing the bulletins he stepped into the open stairway and fell to the bottom. It was held he was not guilty of contributory negligence as a matter of law.

We are unable to see anything in any of these decisions which will exculpate the appellant here from the charge of contributory negligence under his own testimony. In some of them the holding is based on the ground that the obstruction was not obvious or of sufficient magnitude necessarily to challenge the attention of a rea-sonably observant person. In others the pedestrian was frightened.

In the Brown case the plaintiff, an elderly man, was confronted with an emergency calling for concentration and quick action, when he tried to head off the calf in the alley. In the Powers case the plaintiff fell into a dark stairway at night when taking the first step, as he was leaving a crowd standing on the sidewalk.

But none of these circumstances were present in this case. The appellant was proceeding along the sidewalk in broad daylight. The elevator opening, or at least the barriers 3½ feet high, were plain to be seen. He was not frightened or acting in an emergency. He could have glanced forward from time to time observing his course, but he did not. He could have seen the obstruction a long way ahead. His excuse for not doing so is that he lit a cigarette, and thereafter kept his eyes on a man on the other side of the street he thought was Ralph Ray. Thus engaged he proceeded forward five or ten steps, 12 to 25 feet. Appellant insists in his brief that when testifying he never did say positively how many feet he went or how many steps he took at this juncture. The record shows he estimated the distance over and over again at five to ten steps or more. But be that as it may, the fact is clear he walked a substantial distance.

We do not mean to say, of course, a pedestrian will not be excused in some circumstances for a failure to keep an eye ahead, though in other circumstances at the same time and place he would be bound to look. Fright, an emergency, something of that sort, sometimes even conversation or the greeting of an acquaintance, may dominate or principally claim his attention for the time being, but he cannot go along altogether inattentive with nothing to occupy him but his own reflections or the fact that he believes he sees a friend across the street, especially when there is an obvious obstruction just ahead in plain sight.

The order and judgment of the circuit court awarding a new trial to all the defendants is affirmed. *Seddon* and *Ferguson, CC.*, concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.