245 S.W.2d 695 (1952)
CLINE
v.
CITY OF ST. JOSEPH.
No. 21605.
Kansas City Court of Appeals, Missouri.
January 7, 1952.
*696 Whitney W. Potter, City Counselor, Francis A. Pickle, Joseph L. Flynn, Asst. City Counselors, St. Joseph, for appellant.
*697 Wm. Orr Sawyers, James P. Hull and William C. Cole, St. Joseph, for respondent.
BOUR, Commissioner.
The plaintiff, Mrs. Lucy Cline, while walking on a public sidewalk in St. Joseph, Missouri, stepped into a hole in the sidewalk, fell, and was injured. She brought this action against the city to recover damages for her injuries, and obtained a verdict and judgment for $3,500. Defendant appealed.
No point is made concerning the sufficiency of the pleadings, and defendant does not contend that proper notice of the accident was not given, or that no case was made for the jury on the issue of the city's negligence. Defendant relies upon the following points: (1) that the court erred in overruling its motion for a directed verdict at the close of the whole case, because the evidence showed that plaintiff was guilty of contributory negligence as a matter of law; (2) that the evidence was not sufficient to support the verdict; and (3) that the verdict was so excessive as to indicate bias and prejudice on the part of the jury. We will consider these points in the order mentioned.
The evidence showed that Seventh street is a north and south street and that Faraon street and Jules street run east and west intersecting Seventh street. Jules street is the next street south of Faraon street. The sidewalk in question is in the 300 block on the east side of Seventh street and extends from the south curb line of Faraon street to the north curb line of Jules street. It is a concrete sidewalk about 12 feet wide. The defect in the sidewalk was about 9½ feet north of the north curb line of Jules street and 9 feet east of the east curb line of Seventh street; which means that it was near the northeast corner of Seventh street and Jules street. The testimony and the pictures introduced in evidence showed that the defect consisted of a circular hole about 12 inches in diameter. Several witnesses for plaintiff testified as to the depth of the hole, their estimates varying from "one inch, more or less" to 3½ inches. Plaintiff testified that she looked at the hole immediately after she fell and it was "almost a foot each way" and 2½ to 3 inches deep. It was shown that the defect had existed for some months prior to the accident. One witness said seven months; one said eight or nine months; and another ten months.
On the day of the accident a construction company was putting an asphalt surface on that part of Seventh street between Faraon street and Jules street. James Walker, an employee of the construction company, testified as a witness for plaintiff that a barrier had been erected across Seventh street near the intersection of Seventh street and Jules street and "about even with what would be the north curb line of Jules street if it were extended across 7th"; that just before plaintiff fell on the sidewalk he was directing traffic at the intersection; and continued: "There was a truckload of asphalt coming up 7th * * * and I swung the barricade on the east side of 7th to let the truck in and stopped the traffic going east and westboth waysso the truck could come on through. * * * And when I swung the barricade back I seen her step in the hole and fall."
Plaintiff was injured on July 30, 1948, between 4:00 and 5:00 o'clock in the afternoon, while walking south on the sidewalk toward the intersection of Seventh street and Jules street. Plaintiff testified that she and her husband had lived at 610 North Seventh street since 1942; that in going from their home to the business district it was their practice to walk west to Sixth street, then turn south on that street, but that on the afternoon in question she walked south on the east side of Seventh street because her destination was the office of an insurance company located on the east side of Seventh street and south of Jules street. She further testified:
"Q. How long in months prior to July 30 would you say that you had last been down that street? * * * A. Oh, it had been a year, maybe, or 8 or 10 months anyhow. * * *
"Q. Had you ever seen this hole before that time when you fell in it? A. No, sir, I never had." *698 Plaintiff, in describing her actions immediately before and at the time of the accident, testified as follows:
"Q. Was there any repair work going on on 7th? A. Yes, there was, but I didn't pay any attention to it until I got almost to the Church. I was just walking along normally and I noticed they were resurfacing the street. * * * I was on the east side of the street, and I was walking along * * * and I noticed the traffic was awful heavy.
"Q. Along where? A. On Jule street. And I seen that it was blocked off on 7th Street. I wasn't looking down at my feet. * * * And I watched this truck to see when I could get a chance to cross. I knew there was a stop sign on 6th and Jule and I thought if I could get a chance to see it come on I could get a chance to cross. There were two cars passed when I was looking and just as I started to turn my head to look west I seen this fellow standing in the middle of the street.
"Q. Which fellow? A. This Mr. Walker. * * * He didn't make any signals or anything but he was standing there and just as I turned my head to look I stepped in this hole. * * * As I said, I was watching the traffic and I just stepped in it. I never seen the hole before. * * * I went clear down. I was laying on my side. * * *
"Q. Which foot was it went into the hole? A. My right foot. * * *
"Q. Did you see this hole prior to the time that you fell in it? A. I didn't."
Plaintiff testified on cross-examination:
"Q. What were you looking at as you walked toward 7th and Jule? A. They were working on that street I noticed after I got about half way between Faraon and Jule.
"Q. Were you watching them work? A. No, I wasn't. It didn't interest me at all. * * *
"Q. What were you watching? A. I was looking out for traffic when I got there. * * *
"Q. Nevertheless, you didn't see this hole until after you fell? A. No, sir, I didn't. * * *
"Q. When you had your eyes to the west there looking at traffic or saw this other man there, that is when you stepped into the hole? A. Yes, sir. * * *
"Q. You didn't look where you were going? A. No. I wasn't looking where I was going because I was watching the traffic. * * *
"Q. That particular place is north of what would be the north sidewalk of Jule, isn't it? A. Yes, sir.
"Q. That is quite a wide sidewalk, the Jule street sidewalk on the north? A. Yes, it is wide. I never paid any particular attention to any of the sidewalks." Plaintiff further testified on cross-examination that the day was clear and that there was nothing to obstruct her view as she walked south toward Jules street.
Defendant contends that plaintiff was guilty of contributory negligence as a matter of law because the evidence shows "that although the hole could have been seen for a distance of 55 paces (121 feet) and approximately a half to three quarters of a block to the north, that nevertheless she failed to see it and stepped into it"; that "she didn't look for approximately one hundred and twenty-one feet, fifty-five paces, from the point by the steps of the minister's home, where the hole could be seen, up to the place where she fell and that the hole was an obvious defect, plainly seen in the sidewalk." In support of this argument, defendant emphasizes certain testimony of two witnesses for plaintiff; namely, Mrs. Frank O'Neal and Fred Porter. The testimony in question was elicited on cross-examination. Defendant also relies upon the testimony of its own witness, the city engineer. We have not included any of this testimony in our statement of the evidence, as it does not aid plaintiff's case. For the purpose of determining the issue presented, we must disregard defendant's evidence, unless it aids the plaintiff's case, and consider only the evidence most favorable to plaintiff and the most favorable inferences arising therefrom. Thempson v. Byers Transp. Co., Mo.Sup., 239 S.W.2d 498, 500; Becker v. Aschen, 344 Mo. 1107, 1112, 131 S.W.2d 533, 536. Furthermore, the court may direct a verdict *699 for defendant only when the facts in evidence and the legitimate inferences drawn therefrom are so strongly against the plaintiff as to leave no room for reasonable minds to differ. Trower v. Missouri-Kansas-Texas Railroad Co., 347 Mo. 900, 908, 149 S.W.2d 792, 795.
The standard of conduct to which a plaintiff must conform for his own protection and in order that he may not be guilty of contributory negligence as a matter of law, like the standard to which a defendant must conform for the protection of the plaintiff or the class to which he belongs, is based upon the conduct of a reasonably prudent person under similar circumstances. Restatement, Torts, sec. 475. Hence a person walking on a public sidewalk or street is required to exercise such care as a reasonably prudent person would exercise, under the circumstances, to discover and avoid dangerous defects and obstructions. Sloan v. American Press., 327 Mo. 470, 37 S.W.2d 884; 63 C.J.S., Municipal Corporations, § 848, p. 192. This does not mean that a pedestrian is required as a matter of law to pay exclusive attention to the sidewalk or street immediately in front of him. In determining the attention which can be reasonably expected from the pedestrian, account is taken of the circumstances surrounding him. Little v. Kansas City, 239 Mo.App. 1007, 197 S.W.2d 1005; Lovins v. City of St. Louis, Mo.App., 90 S.W.2d 430; Merritt v. Kansas City, Mo.App., 46 S.W.2d 275. It has been held, therefore, that a pedestrian's failure to discover and avoid a dangerous defect or obstruction may be excused where his attention was diverted for sufficient cause and under such circumstances that the attention of a reasonably prudent person might be so diverted. Newdiger v. Kansas City, 342 Mo. 252, 265, 114 S.W.2d 1047, 1054; Gray v. City of Hannibal, Mo.Sup., 29 S.W.2d 710; Kelley v. Kansas City, 153 Mo.App. 484, 133 S.W. 670; Bentley v. Rothschild Brothers Hat Co., 144 Mo.App. 612, 129 S.W. 249; Lattimore v. Union Electric Light & Power Co., 128 Mo.App. 37, 106 S.W. 543. See also Butler v. City of University City, Mo.App., 167 S.W.2d 442, 446; Annotation 70 A.L.R. 1358, 1388.
Defendant relies upon the case of Sloan v. American Press, supra. In that case the plaintiff was injured by falling into an open elevator shaft which was located almost in the center of the sidewalk in front of defendant's premises in St. Louis, and which was used mainly for the purpose of lowering news print to the basement. The opening was about 64 or 74 inches long east and west by 40 or 50 inches wide. When the elevator was not in use the opening was covered by two iron doors which operated on hinges. When the elevator was in use, the doors were raised so they stood perpendicular to the sidewalk and served as guards or barriers some 20 to 24 inches high, on the north and south sides of the opening. While in this position the doors were fastened to iron-mesh screens 3½ feet high which served as guards on the east and west sides of the opening. At the time of the accident the doors were open and in the position described. The elevator platform was at or near the bottom of the shaft. In describing the accident the plaintiff testified that he was walking west on the sidewalk, in midafternoon, when he stopped to light a cigarette; that thereafter he kept his eyes on a man on the other side of the street whom he thought was Ralph Roy; that while thus occupied he proceeded forward 5 or 10 steps, 12 to 25 feet, ran against the barrier on the north side of the opening and fell into the elevator shaft; and that he had no previous knowledge of the opening as the occasion was his first visit to St. Louis. The Supreme Court held that the plaintiff was guilty of contributory negligence as a matter of law in failing to observe and avoid an obstruction of such magnitude as the one involved.
After reviewing many cases, the Supreme Court said 37 S.W.2d loc. cit. 890: "Without going further, it is evident that all the cases, even the dissenting opinion in the Ryan Case [Ryan v. Kansas City, 232 Mo. 471, 134 S.W. 566, 985], require a pedestrian to have some concern for *700 his own safety in walking on a public sidewalk though he may be innocent of knowledge that there are defects or obstructions along the way. He does not have to be constantly on the alert for defects not plainly observable, but neither may he go along paying no attention to where he is walking so that he would fail to see and avoid obvious obstructions. He must proceed as a reasonably prudent footman would do, with his eyes open and having regard for his general course." At the end of the opinion the court stated, 37 S.W.2d loc. cit. 891: "We do not mean to say, of course, a pedestrian will not be excused in some circumstances for a failure to keep an eye ahead, though in other circumstances at the same time and place he would be bound to look. Fright, an emergency, something of that sort, sometimes even conversation or the greeting of an acquaintance, may dominate or principally claim his attention for the time being, but he cannot go along altogether inattentive with nothing to occupy him but his own reflections or the fact that he believes he secs a friend across the street, especially when there is an obvious obstruction just ahead in plain sight."
It is clear that the Sloan case does not support the contention of defendant herein. In the case at bar the plaintiff did not fall into a large opening guarded by barriers on each side. She stepped into an unguarded hole about 12 inches in diameter and 2 or 3 inches deep. As shown above, plaintiff testified that just prior to the accident she was "walking along normally"; that she "noticed they were re-surfacing the street"; that at the time she fell she was watching the heavy traffic on Jules street; and that she did not see the hole until she stepped into it. It will be remembered that the hole was about 9½ feet north of the north curb line of Jules street and that plaintiff intended to cross that street. Defendant emphasizes the following testimony of plaintiff: "I wasn't looking down at my feet. * * * I wasn't looking where I was going because I was watching the traffic. * * * I never paid particular attention to any of the sidewalks." According to plaintiff's evidence she had no knowledge of the hole in the sidewalk prior to the accident. It cannot be said, then, as a matter of law, that she was required to watch every step she look or to pay "particular" attention to the sidewalk. Nor can we declare, as a matter of law, that the defect in question was so conspicuous that "a reasonably prudent footman" would not have failed to see and avoid it under the circumstances disclosed by the evidence. Guided by the authorities cited above, including the Sloan case, we hold that it was for the jury to determine whether or not plaintiff was guilty of contributory negligence. It follows that the court did not err in overruling defendant's motion for a directed verdict.
Defendant's second contention is that the evidence was insufficient to support the verdict. In its argument in support of this contention, defendant raises the same question as that presented by the motion for a directed verdict; that is, the question whether plaintiff was guilty of contributory negligence as a matter of law. What has been said above necessarily disposes of defendant's second point.
Defendant also contends that the verdict for $3,500 was so excessive as to indicate bias and prejudice on the part of the jury. As heretofore stated, James Walker saw plaintiff fall on the sidewalk. Plaintiff testified that Walker came to her assistance and offered to call a doctor or an ambulance; and continued: "I said, I think I can make it.' * * * My foot and my knee wasn't hurting at the time but before I took many steps they began to hurt. I don't know how I got home but I made it. * * * My foot was hurting until I could hardly walk and my knee was hurting. * * * And I have steps up to my house * * * fifteen or twenty but some way I held onto the banisters and got up. * * *
"Q. That is quite a long pull from Robidoux street up to where your house is? A. Yes, sir.
"Q. Quite an incline? A. It seemed double that day." Plaintiff's home was *701 about 3¾ blocks from the place of the accident.
As stated, the accident occurred between 4:00 and 5:00 o'clock in the afternoon. Dr. Boteler was called to plaintiff's home that evening. The next day plaintiff's husband took her to the office of Dr. Jacob Kulowski. Plaintiff testified that Dr. Kulowski put a plaster cast on her right foot and ankle and told her to use crutches in walking; that she wore the plaster cast eight weeks and walked with crutches about a year; that thereafter she walked with the aid of a cane, but that she was not able to get around to any extent. Her testimony showed that at the time of the trial, which was more than two years after the accident, she still suffered from pain in her back and right foot, and she still used a cane. "When I get my foot comfortable and my back, I can go to sleep. I have to put my foot on a pillow or sometimes in the night I have to get up and soak it in hot water. * * * Sometimes I have to take something to kill the pain." There was some stiffness in her right foot and ankle; and she wore a special type of shoe on her right foot. While plaintiff was on the witness stand she removed her shoe and stocking and exhibited the injured foot to the jury.
Dr. Jacob Kulowski, an orthopedic surgeon, testified that plaintiff gave him a history of her case when he first saw her on July 31, 1948, the day after the accident; that her right foot and ankle were swollen and discolored; that X-rays of her right foot and ankle disclosed "several breaks and one on the tip of the outside ankle bone. One break was * * * at the neck of the fifth metatarsal bone leading out to the toe. There was a chip break at the base of this fifth metatarsal bone * * * and a chip fracture at the lateral border of the cuboid bone"; that he placed her right foot and ankle in a plaster cast which she wore until September 4, 1948; that after the cast was removed the ankle was strapped with adhesive tape and she was put on crutches; that thereafter he attempted to increase the patient's ability to walk by different orthopedic measuresdiathermy, massage, heat, shoe corrections and a brace attached to her shoe; that when he examined plaintiff on May 22, 1950, he found "a tenderness chiefly around the bottom of the foot and ankle joint" and "she was still having considerable pain in her foot and stated this pain was present also at night." (The case was tried on October 23, 1950.) It was his opinion that she had "a partial permanent disability of the right foot and ankle in the neighborhood of twenty-five per cent," and he thought her condition at that time was "more or less stabilized or stationary"; and continued:
"Q. This condition as to a twenty-five per cent disability that you testified to? Will that continue the rest of her life? A. In all probability, yes." He stated on cross-examination that her condition might improve"there is always a possibility." When asked on cross-examination whether "walking three and a half blocks after she fell would have a tendency to aggravate the injuries," he replied: "I would say she took a lot of pain."
In January, 1949, and about nine months before the trial, Dr. James O'Donoghue and Dr. Paul A. Knepper examined plaintiff at the request of defendant. Dr. O'Donoghue testified as a witness for defendant that X-rays of plaintiff's right foot and ankle showed but one fracture and that fracture was "at the distal end of the fifth metatarsal." He further testified:
"Q. I would like to ask you if a person having suffered a fracture, would walk a distance of 3¾ to 4 blocks from the place the fracture occurred, would you say it is a reasonable probability that by the doing of that it would aggravate such a fracture? A. I would assume that any additional amount of trauma, or injury, to a fracture would aggravate the condition more or less." Dr. Knepper's testimony was in accord with the above testimony of Dr. O'Donoghue. He also testified that "this lady has a 25 per cent permanent disability of the right ankle" but "it would be impossible to tell how much of this 25 per cent would be due to the fall and how much may possibly, or probably, be due to the *702 aggravation of it by walking four blocks home."
In support of its contention that the verdict was excessive, defendant says: "An examination of the record leaves no doubt that plaintiff, herself greatly aggravated her fractured foot by negligently failing and refusing to accept an offer of medical aid and an ambulance, and walking on the fractured foot some four blocks, part of it in the last block up a steep incline and then up twelve to twenty steps to her house. * * * Consequently, in view of the negligent substantial aggravation of the injury by plaintiff herself, we think it is clear beyond question that the verdict of $3500 * * * was not supported by plaintiff's evidence as to her injury, and was so disproportionate as to indicate bias and prejudice of the jury toward defendant-appellant," citing Glasgow v. Metropolitan Street R. Co., 191 Mo. 347, 89 S.W. 915; Russell v. Inhabitants of the Town of Columbia, 74 Mo. 480; Adams v. Carlo, Mo.App., 101 S.W.2d 753. These cases do not support defendant's contention.
As a general rule there can be no recovery for losses which might have been prevented by reasonable efforts on the part of the person injured. A failure to attempt to mitigate damages will not bar plaintiff entirely from a recovery, but will only prevent the recovery of such damages as might have been avoided by reasonable efforts upon his part. 25 C.J.S., Damages, § 33, p. 502; 25 C.J.S., Damages, § 36(b), p. 508. In Adams v. Carlo, supra, 101 S.W.2d at page 756, the court said: "Upon the issue of the aggravation of the injury sustained, it is indeed a well-settled principle of the law of damages that one who suffers an injury is bound to exercise reasonable care in seeking and accepting medical aid, and that if the injury is aggravated by reason of the injured person's neglect in such respect, then he will not be permitted to recover for such of his injuries and disability as might have been prevented by reasonable efforts on his own part." (Citing cases.) The efforts which the injured party must make to avoid the consequences of the wrongful act or omission need only be reasonable under the circumstances of the particular case. Koonse v. Standard Steel Works Co., 221 Mo.App. 1231, 1243, 300 S.W. 531, 537. And the burden is upon the defendant to show that some of the consequences of the injury might have been avoided by the exercise of reasonable care on the part of the injured party. 25 C.J.S., Damages, § 144(e), p. 791. In the instant case, plaintiff's witness, Dr. Kulowski, did not testify that plaintiff's conduct in walking home "would have a tendency to aggravate the injury," as defendant asserts in its brief. He stated: "I would say she took a lot of pain." The jury had the right to disbelieve the testimony of defendant's medical witnesses. While plaintiff was under a duty to exercise ordinary care to prevent an aggravation of her injury, we cannot say as a matter of law that she "greatly aggravated her fractured foot by negligently failing and refusing to accept an offer of medical aid and an ambulance, and walking on a fractured foot some four blocks." In fact the defendant's own doctors were unable to estimate the extent of the alleged aggravation and, as stated, defendant had the burden of proof as to mitigation of damages. So upon the question of the aggravation of plaintiff's injury, whatever issue there was in the case was for the jury to determine under instruction B submitting that issue. Instruction B was given at the request of defendant.
There is no definite rule by which the court can determine whether a verdict was excessive. Each case must be considered on its own facts, giving some consideration to economic conditions existing when the verdict was returned and having due regard to the maintenance of reasonable uniformity of awards for similar injuries. Berry v. Emery, Bird, Thayer Dry Goods Co., 357 Mo. 808, 211 S.W.2d 35, 44. The determination of the amount of damages is, of course, primarily for the jury, and in this case the verdict has been approved by the trial judge who not only observed the plaintiff throughout the trial, *703 but also had an opportunity to ascertain whether the jury was influenced by either sympathy or prejudice in arriving at its verdict. The appellate court should not interfere unless the verdict was so excessive as to offend against all sense of right. Considering the evidence in the light most favorable to plaintiff, we cannot say the verdict was manifestly excessive.
Finding no errors, the verdict should be affirmed, and the Commissioner so recommends.
SPERRY, C., concurs.
PER CURIAM.
The foregoing opinion of BOUR, C., is adopted as the opinion of the court. The judgment is affirmed. All concur.