METZETUES BURR, Respondent, v. KANSAS CITY PUBLIC SERVICE COMPANY, a Corporation, and FRANK P. FERLAS, Defendants, KANSAS CITY PUBLIC SERVICE COMPANY, Appellant, No. 43817—276 S. W. (2d) 120.

Court en Banc, March 14, 1955.

*Charles L. Carr* and *Frank J. Rogers* for appellant.

116

*David T. Cavanaugh, Thomas E. Hudson* and *Hudson & Cavanaugh* for respondent.

[121] DALTON, J.—Action for damages for personal injuries sustained by plaintiff, a passenger on defendant Kansas City Public Service Company's bus, when the bus and a Dodge automobile, the latter operated by defendant Ferlas, collided head-on on Tenth street in Kansas City, Kansas, on October 13, 1949, about 9:40 p.m. Verdict and judgment were for plaintiff and against both defendants for $15,000. Defendant Kansas City Public Service Company has appealed and here contends (1) that the trial court erred in submitting the cause against said defendant under the res ipsa loquitur doctrine; (2) that instructions 1 and 2 are erroneous; and (3) that the verdict of the jury is excessive and so excessive as to show passion and prejudice against said defendant.

At the time of the collision in question plaintiff, a fare-paying passenger, was seated on the right-hand side of the bus in the second seat from the front and next to the aisle. The bus was southbound on Tenth street, a paved north-south street approximately 40 feet wide. The last stop of the bus prior to the collision was at Central avenue and the collision occurred about two blocks further south and before the bus reached Pacific avenue. Although the collision occurred in the State of Kansas, there is no reference in the briefs to any applicable Kansas statutes or court decisions.

Plaintiff, who was her sole witness as to the collision, testified that the bus was moving along in the normal fashion, downgrade, "and then all at once there was a crash, and it pitched me forward and hit me on the bar across the seat * * * It (the bus) stopped after it hit whatever it was." When plaintiff was thrown forward, her left shoulder hit the metal grip or bar on the end of the seat in front of her and she sustained an injury. Shortly after the collision, plaintiff went to the front of the bus and looked out. She saw that the bus had stopped "right up against" an automobile. The bus operator had made no outcry and plaintiff had received no "warning of any impending stopping of the bus."

On cross-examination plaintiff said that, prior to the collision, she had seen nothing unusual about the way the bus was being operated; that the bus did not slow [122] down prior to the collision; that the operator "did not honk his horn"; that the bus was being operated "right in the middle of the street"; that cars were parked on both sides of the street, but she did not notice how close the right-hand side of the bus was to the parked cars; and that, when she looked out of the front window, the bus was "still in the middle of the street" and up against the Ferlas car, which was "pretty well over on the right." The front of the car "was right up against the left-hand side of the bus * * * on the east." The bus was turned slightly to the left or to the east into the automobile of Mr. Ferlas.

The day after the collision the bus company sent plaintiff a questionnaire, which she executed and returned to the company. As a part of her cross-examination the defendant offered the statement in evidence. Some of the questions and answers were: ''Q. Did you see the accident? A. I heard the crash. Q. Where were you when the accident took place? A. On west side of bus going south. Q. What part of vehicle came in contact with bus? A. Left side of automobile (front). Q. (a) What was the speed of bus? (b) of vehicle? A. (a) Ordinary. (b) I couldn't say. Q. Who, in your opinion, is to blame for accident? A. The bus was on the right side of street. I didn't see the automobile until after it hit.'' In answer to the general question, ''How did the accident occur?,'' she wrote this statement, ''To my opinion the automobile was coming out of an alley headed west and made a turn to the north. The first I knew was when I was thrown up against the seat in front of me and heard glass breaking. The bus driver was driving very careful. I have been on the bus quite often when he was driving and he always seems to be very careful. I would say the automobile hit the bus.''

The evidence on behalf of defendant Kansas City Public Service Company tended to show that the bus operator was driving the bus southward in the usual manner on its own or west side of Tenth street; that the Ferlas automobile, northbound, was being operated partly on the west or wrong side of Tenth street; that, while the automobile was some distance south of the bus, the operator saw the headlights of the automobile, indicating the automobile was being operated on the west or wrong side of the street; that the operator sounded his horn, flicked his lights, warned the passengers and stopped the bus within 18 to 24 inches of automobiles parked at the west curb; and that the automobile kept coming and, although there was space of 25 feet or more of clearance to the left of the bus for the automobile to pass on the east side of the street, the automobile collided with the bus. The left front headlight and corner of the bus and the left front of the automobile were damaged by the collision.

Defendant Ferlas, testifying in his own behalf, stated he was driving his automobile north on the east side of Tenth street at about 20 to 25 miles an hour. Upon approaching the place of collision, he was blinded by a bright spotlight or headlight shining in his rear view mirror and reflecting into his eyes and, for a few seconds, he was unable to see anything. He started to slow down, but drove a few feet while blinded, and came to a stop on the east or his right-hand side of the street. A couple of seconds later, after he had stopped, there was a collision and he was injured and dazed and did not recall anything further.

Plaintiff pleaded and submitted her cause under the res ipsa loquitur doctrine on the theory that her evidence showed her to be a fare-paying passenger upon the bus of a public carrier and that a collision occurred

120

between the public carrier's bus and another vehicle and plaintiff was thrown forward against the seat in front of her and injured. Rothweiler v. St. Louis Public Service Co., 361 Mo. 259, 234 S.W. (2d) 552, 553; Powell v. St. Joseph Ry., [123] Lt., Heat & Power So., 336 Mo. 1016, 81 S.W. (2d) 957, 958, and cases there cited. And see Annotations 25 A.L.R. 690; 83 A.L.R. 1163; 161 A.L.R. 1113.

Appellant first contends that the court erred in submitting the case under the res ipsa loquitur doctrine because there was no evidence of any unusual movement of the bus and because plaintiff, by her own testimony, showed the cause of the collision and specific negligence on the part of the defendant. Appellant says that plaintiff, by her own testimony, made a submissible case on specific negligence; and that her testimony shows that defendant negligently drove its bus across the center of the street and on to the left side thereof, and not as near the right-hand side as was practicable, and into collision with the automobile of defendant Ferlas. Appellant refers to plaintiff's testimony about the bus being operated in the middle of the street and about Ferlas' car being pretty well over on the right and against the left-hand side of the bus and about the bus being still in the center of the street and turned to the left after the collision had taken place. The rule relied upon is aptly stated in Belding v. St. Louis Public Service Co., 358 Mo. 491, 215 S.W. (2d) 506, a case in which a bus and another vehicle sideswiped in meeting and passing, as follows: " * * * when the plaintiff, having pleaded a case of res ipsa loquitur, goes so far in his own evidence as to point out, and reveal his knowledge of, the specific act of negligence which was responsible for his injury, there is neither room nor necessity for the application of the doctrine. But on the other hand, even though the plaintiff's evidence may tend to show the specific cause of the accident, he will nevertheless not lose the benefit of the doctrine, nor be deprived of the right to rely upon it in the submission of his case, if, after his evidence is in, 'the true cause is still left in doubt or is not clearly shown.'" Appellant relies particularly on Conduitt v. Trenton Gas & Electric Co., 326 Mo. 133, 31 S.W. (2d) 21; Berry v. Kansas City Public Service Co., 343 Mo. 474, 121 S.W. (2d) 825 and Venditti v. St. Louis Public Service Co., 360 Mo. 42, 226 S.W. (2d) 559.

Whether the operation of a motor vehicle in the center, or to the left of the center, of the street was a negligent operation depended upon the detailed facts attending such operation. The fact that the bus may have been operated "right in the middle of the street" did not show specific negligence in failing to operate the bus as near the right-hand side of the street as practicable, absent a showing that the condition of the street to the right of the bus was not occupied and was in such condition that it was in fact practicable to have operated the bus further to the right. No such showing was made by plaintiff. Plaintiff

did not know how close the bus was being operated to the parked automobiles referred to. Plaintiff offered no evidence tending to show that the bus was not in fact being operated as near the right-hand side of the street as practicable. Plaintiff's testimony tends to show that she knew nothing about the location, or operation of the Ferlas' automobile prior to the collision. Her testimony, as to where the automobile and the bus came to rest after the collision was complete, did not show specific negligence in the operation of the bus. The collision happened at night and plaintiff testified to no facts or circumstances attending the collision which show specific negligence in the operation of the bus "right in the middle of the street" or across the center line. Any mere conclusions as to the cause of the collision may be disregarded. White v. St. Louis Public Service Co., (Mo. Sup.), 259 S.W. (2d) 795, 799(1). Plaintiff also testified that no horn was sounded, or the bus slowed, or any warning given to her before the collision occurred, but, likewise, the attendant circumstances are not shown by her testimony and there is no contention here that this testimony was direct evidence of specific negligence on the part of the bus operator.

The facts and circumstances testified to by plaintiff do not show that she had knowledge of the specific negligence causing [124] the collision and her injuries, nor does her testimony show that the direct and proximate cause of the collision was the operation of the bus in the center of the street or across the center line. Clearly, the facts and circumstances testified to do not so directly and definitely show the precise and specific negligent act or acts causing the collision so as to preclude the plaintiff from reliance upon and the submission of her case under the res ipsa loquitur doctrine. Hill v. St. Louis Public Service Co., 359 Mo. 220, 221 S.W. (2d) 130, 133(4); Rothweiler v. St. Louis Public Service Co., supra, 234 S.W. (2d) 552, 553; Belding v. St. Louis Public Service Co., supra, 215 S.W. (2d) 506, 510; Williams v. St. Louis Public Service Co., 363 Mo. 625, 253 S.W. (2d) 97, 100-102. The assignment is overruled.

■ Appellant next complains of the giving of instructions Nos. 1 and 2. Plaintiff's instruction 1, after requiring the preliminary finding that plaintiff was a passenger on defendant's southbound bus traveling on Tenth street, directs a verdict on the finding that defendant's servant "* * * in charge of and operating said bus, caused, allowed and permitted the same to come into contact and collide with the automobile of defendant Frank Ferlas being operated in' a northerly direction on 10th Street, if so, and plaintiff was caused to be thrown into and against the metal part of the seat of said bus, as shown by the evidence, if so, and defendant Kansas City Public Service Company was thereby negligent, if you so find, and the negligence of said Kansas City Public Service Company, if so, caused or contributed to cause the plaintiff's injuries, if you find she was injured * * *.''

It is contended that this instruction "directs a verdict on a finding by the jury of the happening of the accident, resulting injury to plaintiff and that defendant was thereby negligent without requiring a general finding of negligence and without any consideration of the other facts and circumstances in evidence." Appellant says "the instruction does not require a finding that the bus was negligently caused, allowed and permitted to collide * * *"; and that the instruction "is abstract and gives the jury a roving commission (even under a general negligence submission) and does not require a finding of essential facts necessary to place liability on defendant." Appellant further says the evidence presented two conflicting factual situations; that a verdict directing instruction should have hypothesized a finding of facts necessary to a verdict for plaintiff; and that the instruction required no finding of facts "which would speak negligence on the part of defendant's bus operator, or from which it could be reasonably inferred that the operator's negligence was the cause of the collision * * *."

The assignment must be overruled. We have held that the cause was properly submitted under the res ipsa loquitur doctrine. The instruction sufficiently requires a finding of a passenger and carrier relationship, defendant's operation of the bus, a collision with another vehicle, injury to plaintiff, negligence of defendant and that such negligence caused or contributed to cause the collision and plaintiff's injury. See Venditti v. St. Louis Public Service Co., 362 Mo. 339, 240 S.W. (2d) 921, 925. Further, the instruction must be read and considered with instruction No. 2 which reviewed and required a finding of the same facts as instruction No. 1, except that no finding that defendant was negligent was required, but the instruction concluded, as follows: "* * * and plaintiff was caused to be thrown into and against the metal part of the seat of said bus and was injured as a result thereof, then you are instructed that such facts, if you believe them to be true, are sufficient circumstantial evidence upon which the jury may infer that the defendant Kansas City Public Service Company was negligent and you may so find unless you find and believe from other evidence and from all the facts and circumstances in evidence, that said collision of said bus was not due to negligence of the defendant Kansas City Public Service Company."

[125] Appellant contends (1) that instruction No. 2 was erroneous because plaintiff proved specific negligence and could not, avail herself of the res ipsa loquitur doctrine; (2) that the instruction did not require a finding of negligence; and (3) that the instruction erroneously placed the duty on defendant to disprove negligence and ignored the affirmative duty of plaintiff to prove negligence. The instruction was neither a burden of proof, nor a verdict directing instruction and it was unnecessary for the instruction to require a finding of negligence or to advise the jury as to which of the parties had the burden of proof.

Instruction No. 1, a verdict directing instruction, required a finding of negligence as a condition to a verdict for plaintiff. Instruction No. 6 advised the jury that the burden of proof was upon the plaintiff to prove her case by a preponderance, that is, the greater weight of the credible evidence. Instruction No. 5 defined the terms, "negligence," "negligent" and "negligently." We have previously ruled that the plaintiff's evidence did not show specific negligence; and that the cause was properly submitted under the res ipsa loquitur doctrine. In advising the jury "that such facts, if you believe them to be true, are sufficient circumstantial evidence upon which the jury may infer that the defendant Kansas City Public Service Company was negligent and you may so find unless you find and believe from other evidence and from all the facts and circumstances in evidence, that said collision of said bus was not due to the negligence of the defendant Kansas City Public Service Company," the instruction did not impose upon defendant the duty to disprove negligence, but only advised the jury as to what they might find from certain evidence, unless they found the facts otherwise. The instruction is not similar to the one condemned in the case of Rothweiler v. St. Louis Public Service Company, supra, 234 S.W. (2d) 552.

The final assignment concerns the amount of the verdict. Appellant contends (1) that the verdict for $15,000 is excessive and that it "should be reduced very substantially"; and (2) that the verdict "is so excessive as to show passion and prejudice on the part of the jury," that "the excessiveness of this verdict cannot be cured by remittitur" and that "the cause should be reversed and remanded on account of the excessiveness alone."

Plaintiff was a housewife and prior to the receipt of her injuries, she had done all of her own housework without assistance, such as cooking, washing, ironing, cleaning, hanging out clothes and working in and about the place. She was approximately 59 years of age when injured (62 at the time of the trial in February 1953). As stated, when the collision occurred plaintiff was thrown forward and her left shoulder struck the grip or bar on the end of the seat in front of her. When she reached home she was having some pain and took aspirin for it. She disrobed and observed a red mark on her shoulder, but she assumed her injuries were not serious. The next day her shoulder was sore and began to discolor. Whenever she moved her left arm there would be a sharp pain. There was some swelling and, "as time went on, it got larger" and she applied hot cloths. The area was "black and blue" for quite some time. She had "sort of wrenched" her neck, and it became stiff and sore, there was soreness on her left side and she had headaches. She could not use her left arm, or lift with it, and her collarbone hurt. She consulted her family doctor, Dr. Maurice A. Walker, who examined her and sent her to Dr. P. E. Hiebert for X-rays. Dr. Walker continued to check her condition and ordered the use of hot

and "infra-red ray light on her neck." At his direction she discontinued the use of her arm and put it in a sling for six weeks to two months. During this time she was not able to do her usual and normal household duties, and did not work "to speak of." The swelling on her left shoulder, "about the size of an egg," lasted some two months and gradually disappeared, but the pain and stiffness in her neck and in her left side did not, and "on damp, cold days it is worse."

[126] She had previously had no difficulty or trouble with her left arm or shoulder, but, after her injury and up to the time of the trial, she could not raise her left arm up to comb her hair. She could not reach high enough to hang up clothes, nor could she get her left hand back of her. She just can't do things with that left arm like she used to do. She has continued to have terrible headaches, and pain and stiffness in her neck, conditions that did not exist prior to her injury. She had previously been active in social work and school activities, but, after her injury, she has had to refuse to help with such activities, since she "can't do too much lifting." She has discontinued helping serve in lodge work and such social activities, since she can't attend to the cooking and entertaining connected therewith. She also had to give up a neighborhood club for the same reason.

Dr. P. E. Hiebert (a specialist in the field of radiology, X-ray diagnosis and treatment) saw plaintiff on October 25, 1949 and made an X-ray examination of her left clavicle and the region of the clavicle and the sternum, where they unite to form a joint known as the sternal clavicular joint. He found a paling of the bone, as the calcium had been removed to a slight degree, but was "unable to demonstrate any fracture or broken bone or any dislocation." Carrying the arm in a sling from the 13th to the 25th could possibly have produced this pallor. On account of the swelling he observed and on account of the pain and tenderness complained of, he made a further examination on November 16, 1949, at which time he found that "the space between the sternum and the end of the clavicle was somewhat greater than the space on the right side, which was more normal," and he reached the conclusion that "she had effusion in that joint * * * some water in the joint" as a result of a probable injury or trauma to the acromio-clavicular joint on the left side. The condition observed, that is, this effusion or increase in the interarticular space in the joint would tend to produce pain and discomfort, this because this joint is by its very nature a very poor joint and not mechanically stable, and it is prone to remain sore for a longer period of time than other joints. The area "had all the clinical manifestations of an injury that was of a few days ago," consistent with the history of accident on October 5, 1949. Although the clinical impression from both examinations was that "she should have had some kind of a fracture," no fracture could be demonstrated.

The examination by Dr. M. A. Walker, plaintiff's family physician, on October 24, 1949, disclosed "a yellowish discoloration in the left superclavicular area * * * firm swelling at the sternoclavicular joint, that is the place where the collarbone * * * is attached to the breastbone or sternum, on that area was "a rounded firm tender swelling." Dr. Walker testified: "I thought she had a fracture of the inner end of her collarbone. * * * I had put her arm in a sling, she wasn't able to use it anyway, and I sent her to Dr. Hiebert's office for an X-ray examination. * * * I had her put on heat, various forms, hot pad, hot moist applications and heat lamp. * * * I think that she has a permanent disability of the sternoclavicular joint on the left side due to that injury. * * * She has had changes in that joint that will be permanent, that are permanent." He further said that any treatment that could have been given was given; and that the disability he found could be due to the injury on October 13, 1949. He still sees her periodically and casual examinations have been made, you can see the swelling in the joint. There is a permanent bony swelling and there is crepitation of the joint, a crackling or crunching in the joint when it is moved.

Dr. Alexander Lichtor examined plaintiff on February 6, 1953, at that time she complained of tenderness of the left collarbone (clavicle) with pain on moving of the left shoulder, or moving the left arm at the left shoulder, especially moving the arm away from the body. In addition she complained of headaches in the back of her head, and pain in the upper part of her back when she had her headaches. He [127] found that there was a marked tenderness over the left collarbone toward the breastbone; that the tenderness was not only over the bone but at the joint between the collarbone and the breastbone; that by her moving the left arm, or by having it moved, caused her to complain of a lot of pain in that area; that there was definite limitation of motion of the left arm in all directions but especially in moving the arm away from the body; that there was not a good range of motion; and that motion was definitely limited. Other motions were also limited, that is forward and backward, and the left arm motion was constantly being protected because of the pain; rotation (that is turning the arm laterally or externally) also produced pain; and there was tenderness over the upper border of the left shoulder at the junction of the shoulder and the neck. X-rays taken of the area revealed some osteoporosis, "that is the bone was not strong, it was not as fully filled with calcium and protein as a bone which is present in a normal individual with normal bones or in a younger individual"; and there was a softening of the bone in the area complained of. In his opinion plaintiff was disabled as far as the use of her left arm was concerned. No operations were to be recommended, only conservative treatment with heat and pain tablets. The disability was permanent. The disability could have been caused by her being thrown against the seat at the time of the collision. Defendant offered no evidence concerning plaintiff's injuries.

It will be noted that no special damages are shown, such as hospitalization, medical expenses, loss of wages, et cetera, nevertheless the evidence shows that plaintiff, a housewife, has suffered substantial injury and damage, and that her physical injuries and the impairment of the use of her left arm have resulted in permanent disabilty. Such permanent injuries and the pain, personal inconvenience and handicap resulting therefrom are entitled to full consideration by the trial court and jury and on appeal, regardless of the absence of special damages. Jensen v. Kansas City, 361 Mo. 967, 238 S.W. (2d) 305, 308; Douglas v. Twenter (Mo. Sup.), 259 S.W. (2d) 353; Stofer v. Kansas City Public Service Co., 226 Mo. App. 376, 41 S.W. (2d) 614, 620.

There is no precise method for determining the maximum award which the evidence in this case will support. Each case must be considered upon its own peculiar facts. Due regard should be given to the purchasing power of the dollar, to the rule of reasonable uniformity of awards for similar injuries and to the fact that the jury and the trial judge were in a better position than this court to measure an award of reasonable compensation, as well as to the fact that the trial court has approved the verdict in question.

Considering plaintiff's evidence as true and giving her the benefit of all reasonable inferences arising from it, we think the verdict is clearly in excess of the maximum amount that is reasonably warranted by the evidence and in excess of reasonable compensation for the injuries and damage sustained, however, we do not find the verdict so excessive as to show passion and prejudice on the part of the jury. McCaffery v. St. Louis Public Service Co., 363 Mo. 545, 252 S.W. (2d) 361, 368; Douglas v. Twenter, supra, 259 S.W. (2d) 353, 365.

Appellant has cited many cases where the injuries and damage appear much less severe than those sustained by plaintiff. Kulengowski v. Withington (Mo. App.), 222 S.W. (2d) 579; Hughes v. St. Louis Nat. League Baseball Club (Mo. App.), 218 S.W. (2d) 632 (later transferred to this court and the issue of damages was not decided, 224 S.W. (2d) 98); Wofford v. St. Louis Public Service Co. (Mo. Sup.), 252 S.W. (2d) 529; McBride v. Clarida (Mo. App.), 254 S.W. (2d) 36. Plaintiff, as respondent, has cited cases where the injuries were more severe. McCaffery v. St. Louis Public Service Co., supra, 252 S.W. (2d) 361; Marczuk v. St. Louis Public Service Co., 355 Mo. 536, 196 S.W. (2d) 1000.

[128] It is our conclusion that, on the record presented, the maximum amount for which the judgment appealed from can be sustained is $9,000. If the plaintiff-respondent will within 15 days enter a remittitur of $6,000 as of the date of the judgment below, the judgment will be affirmed for $9,000 as of its date, otherwise the judgment will be reversed and the cause remanded for a new trial. It is so ordered.

*Leedy,* C.J., *Dalton, Hollingsworth, Hyde, Ellison,* and *Westhues,* JJ., and *Cave,* Special Judge, concur.