**Syrel L. STATLER, (Plaintiff) Respondent,**

**v.**

**ST. LOUIS ARENA CORPORATION, a Corporation, (Defendant) Appellant.**

**No. 50652.**

Supreme Court of Missouri,

Division No. 1.

April 12, 1965.

Mogab & Hughes, Charles A. Mogab, Richard L. Hughes, St. Louis, for respondent.

Ackert, Giesecke & Tompkins, David J. Tompkins, St. Louis, for defendant, appellant.

HOLMAN, Judge.

Plaintiff sustained personal injuries while riding as a passenger on one of defendant's amusement devices called the "Flying Cages," which was in operation at

Forest Park Highlands in St. Louis, Missouri. In this suit to recover damages for his injuries the jury returned a verdict for plaintiff in the sum of $22,500. Defendant has appealed from the ensuing judgment.

There were four Flying Cages in the "ride" involved and each operated as a separate unit. No mechanical energy was used in the operation of the device. Each cage was held in place by supporting "arms" with a series of counterweights located on the extensions of these arms which had the effect of overcoming the force of gravity so that a person in the cage could swing the cage back and forth and completely rotate it with the cage always remaining in a horizontal position. As many as four people were permitted to operate a cage. The cage was operated by the passenger's "manipulation of their body, their own weight, they make the cage swing back and forth, and they go higher and higher until, with the proper energy and the proper coordination they can take the cage entirely over the top. The cage always remains upright; the bottom of the cage always remains perfectly horizontal to the cage." The occupants were permitted to operate the cage for approximately three minutes, and when the employee in charge of the operation was ready to apply the brake it was his duty to first warn the occupants to hold onto the rods on each end of the cage.

The braking device was a friction brake with a piece of metal located in the platform just under the cage when it is at rest. When the lever is moved to apply the brake this piece of metal rises above the level of the. platform and comes in contact with a 2 X 4 attached to the underside of the bottom of the cage. The metal piece is attached to springs which permit it to "give" to some extent when it comes in contact with the 2 X 4. The cage is caused to stop by the friction of this brake after it has passed over the brake several times.

Plaintiff, who was 47 years of age at the time of the casualty, went to Forest Park Highlands on June 9, 1962, with other members of his family. At about 2 p. m., he and his stepson decided to ride the Flying Cages. Plaintiff testified that after they entered the cage the operator bolted the door and then gave the cage a shove to get it started; that after trying for a time they were able to get the cage to make a complete. circle; that as it completed its third circle the operator, without warning, applied the brake just as the cage was over the brake platform; that he was then standing with his feet braced on each side of the cage with one hand holding to the bar at the rear of the cage and the other hand holding the bar at the front thereof; that when the brake was applied he felt "a terrible jolt * * * and it threw me over in the air and I let go of my right hand" and fell to the floor of the cage. The operator then grabbed the cage and stopped it and he (plaintiff) was removed from the cage onto a stretcher and taken to the first-aid station where a splint was applied to his right leg. He was then taken by ambulance to Deaconess Hospital.

Plaintiff's testimony was corroborated in all material respects by the testimony of his stepson, Ronald Michael, then 21 years of age.

Plaintiff read in evidence the deposition of Clifton Jollif, the operator of the cage at the time he was injured. Jollif testified that he was operating the cages alone at the time plaintiff was injured; that there was a large crowd and he was very busy; that when he was not too busy he would explain the ride to the customers at the time they entered the cage; that he would later give a warning to them before he applied the brake and would tell them to hold onto the bars because he was going to stop the cage. He stated that when he was real busy he "didn't say much to the customers"; that on this occasion he didn't warn plaintiff before applying the brake; that the brake was applied when

the cage was immediately over the brake platform which caused a "little bit more of a jolt." On cross-examination he admitted that shortly after the occurrence he gave a statement to Mr. Mortarano (apparently representing defendant) which was taken down by a reporter on a stenotype machine. He admitted that he stated in that statement that before he put the brake on he told plaintiff to stand still and hang onto the cage. He testified further, however, that that statement was not true and was given because he was fearful of losing his job if he told the truth. This witness testified that he was discharged a few weeks thereafter.

Wendell Emerick, who was Superintendent of Forest Park Highlands, testified for defendant and stated that Mr. Jollif and other operators of the Flying Cages were instructed to warn customers to hold onto the bars before they applied the brake. He stated that he was standing nearby when this accident occurred and that Jollif did warn the plaintiff and his stepson before he applied the brake. There was evidence that slightly more than 1,000 persons rode the cages during the 12-hour period they were in operation on June 9, 1962.

Plaintiff's case was submitted on the theory that defendant's operator applied the brake when the cage was at ground level without first warning plaintiff to hold on, and that the brake application caused an unexpected jolt or jar as the result of which plaintiff fell and was injured, etc.

 Defendant has briefed the contention that plaintiff did not make a submissible case because there was no credible evidence which would sustain plaintiff's theory as submitted to the jury in his verdict-directing instruction. That contention is obviously without merit. Plaintiff, his stepson, and Jollif all testified that there was no warning to plaintiff before the brake was applied. It is true that Jollif admitted giving an earlier statement to the contrary but testified that the facts

as stated in that statement were not true. While that admission would have a bearing upon the weight and credit to be given to Jollif's testimony, the jury, nevertheless, could believe his testimony if it so desired. We rule this contention adversely to defendant.

The main contentions of defendant upon this appeal relate to the extent of the injuries sustained by plaintiff and the alleged excessiveness of the verdict. It should be stated at the outset that (although he had a fracture of the right ankle) the principal disabling and apparently permanent condition from which plaintiff suffered was a circulatory condition which existed in both of his legs. Plaintiff endeavored to prove that the injuries he received, as heretofore described, caused, or at least aggravated, the circulatory condition. Defendant, on the other hand, contended at the trial, and here contends, that there is no substantial evidence to support a finding that the casualty heretofore described was a proximate cause of the difficulty with plaintiff's circulation, or that it aggravated a pre-existing condition he may have had in that regard. We will accordingly state the evidence relating to plaintiff's injuries in some detail.

Plaintiff testified that when he arrived at Deaconess Hospital he "immediately started having cramps" in his left leg; that they "were so severe my wife asked the doctor if he could do something for my leg * * * so the doctor had the nurse give me a shot"; that after being discharged from the hospital he spent six weeks at home, either in bed or in a wheelchair; that he was walking with a cane when he returned to work the latter part of August; that he was an outside salesman of veterinary supplies for the Dr. LeGear Company and prior to his injury had earned from $700 to $800 per month in salary and commission; that he lost $2,000 in salary and commission during the time he was unable to work because of the injury; that in this work he was required to drive 200 to 300 miles per day;

that he had difficulty working because he got cramps in both legs; that he earned $100 per month less than he did prior to the accident and finally quit his job in January 1963 because he had no circulation in either leg and couldn't walk more than two blocks at a time; that he then went to work for "Midwest Vets Supply" and worked 3½ months at $500 per month but, because of the pain in his legs and his inability to walk, he quit that job and had been unemployed from that time until the trial in November 1963.

Plaintiff further testified that his right ankle was still stiff and swollen and that his ankle turns; "seems like it turns in on me"; that he still has cramps in the calves of both legs and if he walks as much as two or three blocks the calves of his legs "knot up on me" and he has to stand for five or ten minutes before he can go ahead; that he had never had any trouble or disability with his legs before the injury.

Plaintiff was treated at Deaconess Hospital by Dr. Ernest Schaper and his associate, Dr. Macon. Dr. Schaper testified that he found fractures of the tibia, fibula, and astragalus in the right ankle; that the general diagnosis was a "dislocation fracture of the ankle"; that the fractures were reduced and a cast applied to the entire right leg; that plaintiff was then admitted to the hospital where he remained for four days, during which time he was taught to walk with crutches; that there was nothing on the hospital record in regard to any difficulty with the left leg; that the record of the clinic indicated that the first complaint concerning the left leg was on July 2, 1962; that there appeared to be inadequate circulation in that leg and they prescribed a drug to dilate the blood vessels in an effort to increase the circulation. When this witness was asked to give an opinion as to the cause of the circulatory condition he indicated that he could not do so because he had not seen plaintiff at the time that condition was treated. In that connection he stated that

the records did not indicate any opinion of Dr. Macon concerning the cause of that condition; that Dr. Macon removed the cast from plaintiff's leg on July 28, 1962, and that neither of them had seen plaintiff thereafter.

Dr. William A. Stephens, an orthopedic surgeon, testified that he examined plaintiff on July 11, 1962, March 23, 1963, and October 23, 1963. After describing these examinations in detail Dr. Stephens expressed the opinion that as a result of the fracture of the right ankle, plaintiff had a permanent partial disability of the right lower leg, at the ankle, of about one-third; that he might have some residual pain in that area; that plaintiff "has impaired peripheral-vascular disease of both lower extremities, the condition being slightly more severe on the left side. This condition probably existed prior to this accident although the exact cause of the condition is not known at this time." He also testified as follows: "Q. The circulatory condition is one which normally, in a situation of this kind, wouldn't result directly from trauma; in other words, he had the condition before? A. Yes, I think the inherent condition was present before. It might be momentarily aggravated by trauma in this way. * * * Q. In other words, it is your opinion that this circulatory condition would at least return to what it was before the accident? A. Yes, you would expect it to by this time. Q. In other words, this condition was there long before the accident? A. I think so."

Dr. Willard B. Walker, a specialist in vascular surgery, also testified for plaintiff. He stated that he examined plaintiff on September 17, and again on October 19, 1963, and limited his examination to the circulatory problem. Plaintiff sought to show by this witness that the injury aggravated the circulatory difficulty. However, plaintiff failed in that regard because Dr. Walker did not express an opinion that the trauma either caused or aggravated that condition. He did state that "when trauma is sustained the coagulation potential of the blood increases." However, he did not go

further and express any opinion that the increase of the coagulation potential at the time of the trauma actually impaired plaintiff's circulation either temporarily or permanently.

Plaintiff proved reasonable medical expenses as follows: Deaconess Hospital $157; Drs. Schaper and Macon $179; Dr. Stephens $100; Dr. Walker $45; wheelchair rental $19.87; and cost of medicine $15.

Plaintiff, at the request of defendant, was examined by Dr. Robert E. Funsch, on May 13, 1963. Dr. Funsch, in his testimony, described the examination in detail and stated his conclusions as follows: "Q. Do you have any medical opinion, Doctor, as to whether or not Mr. Statler had a good or bad result in the healing of these fractures? A. He has good result in the healing of these fractures. Q. Can you tell me, from your examination and the X-rays, whether or not the fractures have healed in good alignment? A. They have healed in good alignment. Q. Is there any deformity in this foot at all? A. No, sir. Q. Do you have any opinion as to whether or not he will have any great difficulty in walking or getting about with the leg? A. He will not have great difficulty. He will have some degree of difficulty, primarily fatigue, but he will not have any serious difficulty with this ankle." He also stated that he found an arterial insufficiency in the left leg but none in the right leg, and "there is no reason to suspect or believe that this condition is in any way associated with his injury, or that it has become aggravated by his injury."

Before considering the other points briefed by defendant we deem it advisable to decide the issue as to whether the circulatory condition (which apparently caused plaintiff to become permanently disabled insofar as any substantial use of his legs is concerned) was caused or substantially aggravated by the casualty. There was no medical testimony to the effect that the circulatory difficulty resulted from the trauma

and none which would indicate that it aggravated (except "momentarily") the condition. Plaintiff did testify that he had had no trouble with his legs before the accident and experienced cramps in his left leg immediately thereafter. However, in view of all the medical testimony and the nature of the ailment, we do not think that testimony would constitute substantial evidence which would reasonably support a finding that the permanent circulatory condition resulted from the casualty. As one of plaintiff's physicians said, "there is a first time for everything," and it would appear to be a coincidence that he first experienced pain in his left leg shortly after the accident. We accordingly rule that plaintiff's circulatory disability is not to be considered in determining the issue as to whether the judgment is excessive.

■ Defendant contends that the court committed prejudicial error in refusing to give its requested Instruction "A" which would have withdrawn from the consideration of the jury the issue relating to plaintiff's circulatory condition. That instruction reads as follows: "The court instructs the jury that if you find and believe from the evidence the issues herein joined in favor of the plaintiff and against the defendant, then in assessing plaintiff's damages, if any, you shall not consider any damage which plaintiff claims to have sustained to the left leg or the right leg, arising out of, or on account of any damage to the circulatory veins, arteries, blood vessels, and functions thereof, as such claim is not an issue in this case and is withdrawn from your consideration."

It has been said that the giving of "withdrawal instructions is a matter for the sound discretion of the court, and unless such discretion is abused, there is no ground to complain." Atchison v. Weakley, 350 Mo. 1092, 169 S.W.2d 914, 917. The rule more specifically applicable here is that "a trial court will not be convicted of reversible error for failure to give an instruction, unless the instruction is substantially correct,

some authorities say strictly and entirely accurate." Hogan v. Kansas City Public Service Co., 322 Mo. 1103, 19 S.W.2d 707, 711.

If Instruction "A" had been limited to the left leg, or if it had been worded so that it would have withdrawn from consideration the circulatory condition of both legs, which continued to exist after the fracture of the right ankle had healed, it would probably have been a proper instruction. But the instruction offered directed the jury not to consider *any* damage sustained to plaintiff's right leg "on account of any damage to the circulatory veins, arteries, blood vessels, and functions thereof." That direction caused the instruction to be erroneous. The evidence is undisputed that there was a dislocation fracture of three bones of the ankle, accompanied by considerable swelling. That and other evidence would reasonably support a finding that there was at least temporary damage and injury to the blood vessels in the area of the right ankle. The plaintiff was entitled to recover damages for the injury to those blood vessels and yet, if the instruction had been given, the jury would have been told not to consider it. We rule that the court did not err in refusing to give Instruction "A".

Defendant's final contention is that the verdict of $22,500 is excessive and resulted from the fact that the jury was influenced by the vast amount of testimony relating to plaintiff's circulatory disease which had no causal connection with the injuries sustained on June 9, 1962. We have no way of knowing the extent, if any, that the jury was influenced by the evidence mentioned. We will, however, consider the issue of excessiveness and in so doing will limit our consideration to the evidence relating to the injuries to plaintiff's ankle and the extent of disability resulting therefrom. In our determination of that question we will consider the evidence in the light most favorable to plaintiff. "There is no precise method for determining the maximum award which the evidence in this case will support. Each case must be considered upon its own peculiar facts. Due regard should be given to the purchasing power of the dollar [and] to the rule of reasonable uniformity of awards for similar injuries * * *." Burr v. Kansas City Public Service Co., 365 Mo. 115, 276 S.W.2d 120, 127.

We have heretofore stated the evidence in some detail. Plaintiff's special damages would not exceed $3,000. At trial time he had some pain and stiffness in his right ankle. Dr. Stephens was of the opinion that he had a 33⅓% permanent partial disability of that ankle. However, had it not been for his circulatory difficulty, we think it reasonable to conclude that plaintiff could have continued to carry on his work as a traveling salesman.

A careful consideration of the evidence has caused us to conclude that the verdict is excessive by at least $6,500. The case of Bowyer v. Te-Co, Inc., Mo.Sup., 310 S.W.2d 892, supports our conclusion. In that case the plaintiff sustained similar but more extensive injuries than those sustained by the instant plaintiff. We there held that a $20,000 verdict was excessive to the extent of $8,000. The plaintiff in the case at bar, however, is seven years younger than the plaintiff in Bowyer and we therefore consider that the amount he may be permitted to recover could reasonably be fixed at a larger sum than that approved in Bowyer.

If, within fifteen days after the filing of this opinion, plaintiff will enter here a remittitur of $6,500, the judgment will stand affirmed in the sum of $16,000 as of the date of the original judgment. Otherwise, the judgment will be reversed and the cause remanded for a new trial.

All concur.