ESTHER E. WIDENER, Non Compos Mentis, by CHARLES O. WIDENER, Guardian of the Estate and Person of ESTHER E. WIDENER, Plaintiff-Respondent, v. ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, Defendant-Appellant, No. 41437—230 S. W. (2d) 698.

Division One, June 13, 1950.

762

*Mattingly, Boas & Richards* and *Lloyd E. Boas* for appellant.

*John C. Casey* and *Gilbert Weiss* for respondent; *Orville Richardson* of counsel.

764

VAN OSDOL, C.—Action for $150,000 for personal injuries sustained by plaintiff in falling upon the pavement when defendant's bus driver closed the door of defendant's bus on plaintiff's foot as she was alighting from the bus at Gravois and Geyer Avenues in St. Louis in the very early morning of September 30, 1947. The jury returned a verdict for plaintiff awarding $5000 damages, but the trial court sustained plaintiff's motion for a new trial (as to the issues of damages

only) on the specified grounds that the jury's award was inadequate, and that the finding in inadequate amount was against the weight of the evidence. Defendant has appealed.

At the time of trial plaintiff was of unsound mind. She was confined in State Hospital No. 4 at Farmington, having been committed to that hospital by order of the Probate Court of Phelps County, March 6, 1948. Plaintiff's dementia has been diagnosed as "hebephrenic schizophrenia." Previously, December 17, 1945, plaintiff had been committed to the State Hospital at Farmington, but May 12, 1946, she had been paroled to her husband. When she was paroled the prognosis of her case was "guarded," but her condition was then improved. She "had made a satisfactory improvement . . . there is no reason why she should not have gone along satisfactorily under normal circumstances." Evidences of the recurrence of her insanity did not become apparent until sometime after she was injured in alighting from defendant's bus.

Defendant-appellant contends the trial court's order granting a new trial was arbitrary. Defendant-appellant asserts the physical injuries sustained by plaintiff would not support a verdict in excess of the jury's award and there was no substantial evidence plaintiff's recurring insanity was due to her injury. Defendant-appellant did not assign error and move for a new trial on the issues of defendant's liability.

The instant case differs from those cases in which a trial court has approved the amount of a jury's award and overruled a plaintiff's assignment of the inadequacy thereof. For examples, see Dickson v. Beemer, Mo. Sup., 217 S. W. 2d 515; and Wilhelm v. Kansas City Public Service Co., 358 Mo. 6, 212 S. W. 2d 915, cited by appellant.

When a trial court specifies as a ground for sustaining a motion for a new trial that the award of the jury is inadequate, it is equivalent to saying that, in the mind of the trial judge, the verdict (amount of the award) is contrary to the weight of the evidence. Murphy v. Kroger Grocery & Baking Co., 350 Mo. 1186, 171 S. W. 2d 610, and cases therein cited; O'Shea v. Pattison-McGrath Dental Supplies, 352 Mo. 855, 180 S. W. 2d 19. "When the trial court grants a new trial on this ground, an appellate court will not interfere 'so long as there is any substantial evidence to bolster up the trial court's action'; but 'the moment the trial court has ruled adversely upon the motion for a new trial, and has thus put the seal of its approval upon the verdict of the jury, the point of view of the appellate court upon matters having reference to the weight of the evidence changes diametrically, and all presumptions are to be exercised in favor of the verdict . . . and it must be upheld if there is any substantial evidence to uphold it.' State ex rel. Atchison, T. & S. F. R. Co. v. Ellison, 268 Mo. 225, 186 S. W. 1075." Coats v. News Corporation, 355 Mo. 778, 197 S. W. 2d 958.

[We do not mean to say it is the exclusive province of the trial court to determine the weight of the evidence (in ruling motions for new trial) in actions at law where factual issues are submitted to a jury. The appellate court has the ''power'' to examine the weight of the evidence in reviewing the trial court's ruling in such cases; but, as a matter of policy, the appellate court will seldom interfere with the trial court's rulings on motions for new trial (as to matters relating to the weight of the evidence) unless the trial court has arbitrarily or abusively exercised its discretion. This is because the trial judge, present and presiding at the trial, heard and saw the witnesses testify and had the better opportunity to sense the trial atmosphere. King v. Kansas City Life Ins. Co., 350 Mo. 75, 164 S. W. 2d 458; Hemminghaus v. Ferguson, 358 Mo. 476, 215 S. W. 2d 481.]

Inasmuch as the trial court in the instant case did not approve, but disapproved the verdict (as to the amount of the award), and has sustained plaintiff's motion for a new trial on the specified ground the amount of the jury's award was inadequate, the trial court's order in granting a new trial (on the issues of damages only) should be affirmed, if there was substantial evidence to support the view that the jury's award should have been in substantially greater amount—otherwise, the trial court's action in granting a new trial was arbitrary, and the order should be reversed, and the jury's verdict reinstated. The question is—considering the evidence (bearing upon the nature and extent of plaintiff's injury) from a standpoint favorable to plaintiff, can it be reasonably said the jury's award was inadequate? Murphy v. Kroger Grocery & Baking Co., supra; O'Shea v. Pattison-McGrath Dental Supplies, supra; Coats v. News Corporation, supra.

Plaintiff, the wife of Charles Olaf Widener, was thirty-one years of age at the time of her injury. She and her husband had been married in 1938. They have one living child, a son, nine years of age. Another child was dead when born. Plaintiff's husband is a carpenter. In 1943 plaintiff and her husband were employed at Fort Leonard Wood. Plaintiff worked as a nurses' aid for a time, and then worked in the post laundry. Some of the young women employed at the laundry were accused of ''flirting'' with prisoners of war. In July 1945, plaintiff and her husband returned to their home in Edgar Springs. Although there is no evidence plaintiff had any part in any flirtation with war prisoners, the circumstance seems to have had a profound effect on her mental condition. Her mind became so deranged that she was confined at the State hospital for the insane at Farmington, as stated, in December 1945. Upon her parole from the hospital, in May 1946, plaintiff again returned to the former home at Edgar Springs where she and her husband continued to reside until August 1946 when the family went to St. Louis.

In July 1947, plaintiff obtained employment at the Excelsior Laundry Company in St. Louis. Her work was pressing men's suits.

She was "very efficient"; she left that employment in August, when she had difficulty with a party who had been keeping her son while she worked. She was thereafter employed at the Chase Candy Company in St. Louis. In the latter employment, plaintiff weighed candies; she was an apt worker, but reserved and quiet. She did "her duties as she was told to do." If anyone spoke to her, she "was sociable." She earned $32 per week.

About midnight, September 29-30, 1947, plaintiff, then working the "night shift" at the plant of the Chase Candy Company, was returning home on defendant's bus. She was injured when alighting from the bus, as stated supra.

Plaintiff's husband testified that plaintiff arrived at their home about 12:30 a. m., September 30th, and wakened him. In taking off her wraps, she stood in a bending position. She had a "painful expression" on her face; "her eyes were bulged"; she complained that her stomach hurt "like a knife cutting"; her hand, elbow, right knee and ankle were bruised. (July 24, 1944, plaintiff had sustained an operation for umbilical hernia; an eighteen-inch horizontal incision was necessary; the umbilicus was removed; the hernia reduced; and the incision sutured.) Later in the morning of September 30th, plaintiff kept complaining of her stomach; and by looking very closely her husband saw a bulge "sort of in the shape of an egg" in the scar on her abdomen. She went to the hospital that day. A physical examination disclosed contusions of the right elbow, right knee and ankle, and hands. There was no evidence of broken bones or internal injuries. Plaintiff did not then particularly complain of pain in her abdomen, but the examining physician observed a ventral hernia in or near the old operative scar in the right umbilicus region. The protrusion was about the size of an English walnut. The examining physician did not notice any abnormality of her mind.

The physician again saw her on October 4th, when she complained of pain in the lumbar region; October 9th plaintiff complained of backache, pain in the abdomen and ankle, and was "very nervous"; and, on December 9th, plaintiff still had the protrusion in the old hernia scar and again complained of pains in her abdomen. She felt very nervous.

Plaintiff was admitted to the St. Louis City Hospital February 18, 1948; on that date the diagnosis was "recurrent schizophrenia, catatonic." She was again committed to the hospital at Farmington March 6th, as stated supra.

Another physician had examined plaintiff on December 17, 1947. Plaintiff complained of soreness to the left of the coccyx on pressure. The physician observed the old operative scar on the abdomen, and saw the hernia in the old operative area. He was of the opinion the hernia was "due to the accident." He saw superficial scars on the left hand, the right knee and the right elbow. The right ankle was

slightly swollen. But he found no involvement of the joints or loss of motion. Plaintiff's blood pressure was rather high. She appeared extremely nervous and apprehensive. Her speech "was blunt, but jerky," and her eyes seemed to wander from one object to another. She was constantly twisting her handkerchief.

Still another physician, witness for defendant, examined plaintiff February 11, 1948 (seven days before her admission to St. Louis City Hospital, February 18th). He testified plaintiff was "placid and serene," but the doctor made no mental examination "because that was not called to" his attention.

█ A plaintiff is not entitled to recover damages for conditions that are due entirely or wholly to a previous disease, but is entitled to recover for the aggravation of existing ailments, which aggravation is caused by the negligence of a defendant. Schide v. Gottschick, 329 Mo. 64, 43 S. W. 2d 777; Smart v. Kansas City, 208 Mo. 162, 105 S. W. 709; Owens v. Kansas City, St. J. & C. B. R. Co., 95 Mo. 169, 8 S. W. 350. And a plaintiff may recover such damages as proximately result from the activation of dormant disease. Owen v. Dix, 210 Ark. 562, 196 S. W. 2d 913; Hackley v. Robinson, Ia. Sup., 219 N. W. 398; 38 Am. Jur., Negligence, § 82, pp. 741-742.

█ Plaintiff's husband testified that, after the return to Edgar Springs in May 1946, plaintiff performed her household duties and manifested none of the evidences of her insanity; but, "shortly" after her injury, plaintiff's conduct demonstrated the recurrence █ of her mental abnormalities. He testified of the renewal of her inappropriate writings, laughter and gestures, and of the hallucinations indicatory of the recurrence of her dementia.

On the question (was there substantial evidence plaintiff's fall caused the recurrence of her dementia) much depends on evidence plaintiff's derangement recurred soon after the occurrence of her fall. Specialists, witnesses for defendant, did not attribute the recurrence to her "accident." They attributed the recurrence of plaintiff's derangement to the renewal of an intolerable life situation due to the maladjustment of the relations of plaintiff and her husband. They were of the opinion that worry and unsatisfactory marital conditions were responsible for her first hospitalization in 1945; and that her return to the same unhappy and unsatisfactory marital environment occasioned her "second episode" and her rehospitalization in 1948. A physician, specialist in neurology and psychology, witness for plaintiff, was of the view the "accident" was responsible for the second episode. Such opinion was based in part on the assumption the symptoms of the recurrence became apparent "within a short period of time after the accident." The witness also testified, on cross-examination, that his answer would not be different if it were assumed plaintiff, for a period of two and one-half months after the accident, "went along without any obvious evidence of mental or emotional disturb-

ance.'' While it was conceded by defendant's witnesses, experts, that ''accident'' could cause the recurrence of schizophrenia, they expressed the opinion that, if accident is a cause, the recurrence is produced ''within a very short time.'' And the experts, witnesses for defendant, stated, in effect, that ''if she became psychic within a few days after the accident, I would say that the accident was a factor.''

Worry and unsatisfactory and unhappy marital relations and environment, or ''accident'' could have caused the return of plaintiff's schizophrenia. There was evidence tending to show that, after her parole from the hospital in May 1946, plaintiff was normal, performed her household duties, displaying none of the symptoms of her mental affliction, and, in her employment, was an apt and efficient worker until the ''accident'' of September 30, 1947. If within a short time thereafter her mental affliction again became apparent, we think such fact was in the circumstances a reasonable basis for the view her recurring insanity was caused by the accident. We bear in mind the husband testified plaintiff, soon after September 30th, had manifested that conduct identified by physicians as typical of schizophrenia....

Appellant argues the ''connection, if any, between the alleged accident and the recurrence of plaintiff's insanity hangs upon the very thin line of the testimony of her husband.'' Appellant reminds us that prior to February 11, 1948, the husband had not accompanied plaintiff to the offices of the various physicians who had been examining her, and did not cause plaintiff to be admitted to a hospital for treatment. It is argued by appellant that it is unreasonable that a husband would not have caused his wife to be hospitalized, or would have permitted his wife to go about unattended when all the while the wife was manifesting the symptoms of her insanity. The husband on the witness stand explained he had hoped he would not have to put plaintiff back in the hospital, ''thought she might snap out of it.'' We believe appellant's argument only challenges the credibility of the husband as a witness. The trial judge was in a favorable situation to gauge the credibility of the husband and the weight and value of the husband's testimony. And we believe we should not say as a matter of law that the husband's stated conduct was so unreasonable and so inconsistent with his testimony as to destroy its substantial probative effect.

Ignoring the evidence of plaintiff's recurring insanity, we believe that, considering the relevant evidence from a standpoint favorable to plaintiff, it might not be unreasonable to say plaintiff's injuries were such as would justify an award in greater amount than $5000. As stated, plaintiff suffered multiple painful contusions, leaving scars. She complained of pain in her back as late as October 1948. She experienced extreme pain in the abdominal region due to the protrusion of her hernia. Plaintiff is obese, weighing 230 pounds, and is five-feet four-or-five-inches in height. Physicians

testified it is very difficult to successfully repair a recurring umbilical hernia in a person of plaintiff's obese type. This is because the abdominal muscles are very thin. A physician stated he believed the chances of a successful operative repair were not very great, "although there is a possibility." Another physician, witness for defendant, was of the view the hernia could be kept in place by "a properly fitting corset." A physician thought plaintiff would not be able to work at a pressing machine or weigh candies or perform any work requiring her to maintain a standing position. The physician doubted the hernia could be retained by a belt or a truss, because of her fatty, pendulous abdomen. Her hernia is painful; and the hernia is permanent, unless plaintiff risks an operation which could be performed with but doubtful success. And to say the least, plaintiff's painful hernia, its permanency, and her consequent inability to work has occasioned great worry and nervousness.

Upon questions of the inadequacy of awards the so-called "uniformity" rule seems not to be in general use. Hemminghaus v. Ferguson, supra. However, it would not be improper to here observe that an award of $12,500 was reduced by this Court by required remittitur of but $2500 in Powelson v. Chicago M. & St. P. Ry. Co., Mo. Sup., 263 S. W. 149. The plaintiff Powelson, 48 years old, had been a section hand earning $4 per day. His injury, inguinal hernia necessitating the wearing of a truss, reduced his earnings to $2 per day.

Considering all of the evidence bearing upon the nature and extent of plaintiff's injuries (including the evidence tending to show her recurring insanity was due to defendant's negligence) from a standpoint favorable to plaintiff, it is our opinion we should not hold the trial court's action in sustaining plaintiff's motion for new trial (on the issues of damages only) was arbitrary.

The order granting a new trial should be affirmed.

It is so ordered. *Lozier* and *Aschemeyer, CC.,* concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.