288 P.2d 678

Susano LOPEZ, Plaintiff-Appellee,

v.

The ATCHISON, TOPEKA and SANTA FE RAILWAY COMPANY, a corporation, Defendant-Appellant.

No. 5941.

Supreme Court of New Mexico.
Oct. 5, 1955.

Iden, Johnson & Mechem, F. L. Nohl, Albuquerque, for appellant.

Lorenzo A. Chavez, Arturo G. Ortega, Albuquerque, for appellee.

SADLER, Justice.

The defendant as appellant in this Court complains of a money judgment recovered against it in plaintiff's favor for personal injuries in an action prosecuted in the district court of Valencia County under the provisions of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq.

The facts within the scope of the verdict will be stated. The plaintiff is an unnaturalized alien from Mexico, approximately fifty eight years of age at time of the injury complained of. He came to this country through El Paso, Texas, in 1920, worked around Las Cruces for a time on ranches, did logging for a lumber company in Zuni Mountains for three years and began work for defendant at its tie plant near Albuquerque in 1925. He was employed there continuously by defendant from that time until injured on March 20, 1953, or for a period of about 28 years.

On the day of the injury, the plaintiff was engaged with a coworker and fellow employee, one Jimmy Maria, in intercepting railroad ties as they were turned out of a boring machine located a short distance from and above them. The ties moved down a slide between them at the rate of about seven per minute. One of the workers stood on either side of the slide and as a tie moved by them, each would grab the end directly opposite him and together they would toss it onto a cart on a tramway over which they were to be rolled away. In the boring machine from which the ties were emerging, holes were bored in either end of the tie through which spikes would be driven in fastening the rails to the ties when placed in use. The ties were water soaked and oil soaked and weighed about 200 pounds each.

On the day in question both plaintiff and Maria, his coworker, had seized a tie coming down the slide between them. They had not yet disposed of it when the plaintiff suddenly discovered that the tie next approaching them, through striking some obstacle or for some other unknown cause, was out of line horizontally. In order to get out of its way, the plaintiff quickly discarded the tie he was holding and in endeavoring to avoid the rapidly descending tie, stepped into a depression or "dished" out place in the narrow platform between the tracks of the tramway. This threw him off balance and resulted in twisting his left foot severely. It was thought by the jury to be responsible for the disability for which damages were claimed. The jury awarded plaintiff by its verdict the sum of $25,000.

The negligence charged was in the failure of the defendant company to repair

and render safe the depression in the floor of the platform, after having due notice of its presence and of the hazard it created to the plaintiff and other employees engaged in work around and about it. The depression, sometimes referred to by the plaintiff and other witnesses appearing in his behalf as a "hole in the floor," was 12 to 14 inches in length and 2 to 3 inches in depth. It was in no sense a "hole" but was of such a nature that a person working nearby, momentarily forgetful of its presence and suddenly stepping into it, might be caused to fall or suffer such an injury as plaintiff claimed he did.

The issue of whether the plaintiff actually suffered an accident such as he claimed was not too strongly controverted at the trial though, of course, not formally admitted. The issues most vigorously tried out before the jury were whether the disability claimed by him was as extensive as testified to; more, particularly, whether such disability was caused proximately by the injury suffered in the accident in question. It was strongly contended by defendant that it arose from other infirmities, accidents and ailments from some or all of which plaintiff suffered at the time he twisted his foot in the accident as claimed.

The evidence disclosed that the plaintiff was 58 years of age at time of the accident; that for some years he had suffered and still suffered, from diabetes, varicose veins and thrombo-phlebitis, from which latter ailment he had since the accident undergone a surgical operation, during which the surgeon decided against endeavoring to remove the blood clot in a deep vein. The evidence further disclosed that he had previously suffered from infectious hepatitis and at the time was suffering from general arthritis, that is, arthritis incident to oncoming age. In addition, X-rays disclosed an old fracture in the left foot which had healed of its own accord without surgery or disability beyond a lay-off from work of only a few days. Indeed, one physician testifying said this old injury should not be dignified by calling it a fracture and more properly should be designated a tearing of the tissue uniting two segments of bones in the left foot.

▮ But whatever the effect of testimony touching these old injuries may have seemed at the trial, all are resolved by the jury verdict, under instructions not challenged in this Court, and upon evidence which must be deemed substantial, save in the one particular. This particular lies in the contention before us that the award of damages is excessive and can only be attributed to the presence of passion and prejudice in the jury's deliberations.

Thus it is that two errors said to have been committed by the trial court are reserved for review here. The first claim of error is argued under defendant's Point One, reading:

"The trial court erred in refusing to grant appellant a new trial on the grounds that the verdict was excessive and not in proportion to the damages which appellee suffered."

At least two of the medical witnesses, Dr. Boyd and Dr. Kridelbaugh, related the plaintiff's thrombo-phlebitis and the pain about which he testified to the injury suffered in the accident on March 20, 1953. Dr. Boyd testified:

"Q. A man working at—with such a twist or strain, if he already had a minimal fracture or fracture of the foot; if he continued working with his foot lifting railroad ties, that would further aggravate the—or hurt the entire foot that is already injured, would it not be so? A. I believe so.

"Q. Are you sure at this time whether or where his injury—whether his injury is the result of a super-imposed injury to a prior fracture? A. I believe it is. I have never been able to get Mr. Lopez to consistently localize his pain in the fractured side.

"Q. Doctor, do you believe, Mr. Lopez, who is now fifty-nine, will ever be able to return to work with that foot as it is now—to loading railroad ties for eight hours a day? A. No, Sir.

"Q. Doctor, based on your experience as an orthopedic man and as a Doctor, and based on your treatment, the history of this man here; is it, or would it be your opinion that his condition is the probably result of a twist of the foot superimposing thereby an injury to a pre-existing fracture? A. Yes, I believe it is. In my own opinion, I don't believe he will ever recover from the thrombophlebitis which I think contributes to his * * * this is probably in disagreement with other medical testimony. * * *

"The Court: Now, Doctor, what was the most probably cause of thrombophlebitis? A. I believe I will have to say a complication of an injury.

"Q. So it isn't hepatitis that makes this man drag his foot like that and hurt, at this time? A. I don't believe so.

"Q. The diabetes was brought under control by Dr. Simpson? A. Dr. Simpson and Doctor Coons.

"Q. Now, this arthritis shown on those x-rays, is that any more than you would expect of the average common laborer between fifty-seven and sixty-two years of age? A. No, I don't believe so."

Dr. Kridelbaugh also gave testimony as follows:

"Q. Doctor, assuming that Mr. Lopez sustained an injury such as you

described in the history as given you by Mr. Lopez, are you able to express an opinion as to cause of the swelling in that left leg? A. He was shown, at the time of his operation, to have what we call a 'deep thrombosis phlebitis' which is a deep clot in the veins of the leg and from the history he tells, I would have to assume that; either that the injury or the treatment, one or both contributed or were the origin of this disease in the veins.

"Q. Doctor, would you then be able to express an opinion as to the proximate cause of Mr. Lopez's present disability? A. In terms of his veins and the disease in his veins, it would have to be related to the injury and subsequent treatment.

"Q. That is, the injury of March, 1953, Doctor? A. Yes, Sir."

The evidence disclosed that the plaintiff earned $3,072.15 in the year 1952; that his average weekly wage for the six weeks preceding the injury was $82.72. Multiplying his expectancy by the annual wage for 1952, counsel come up with a gross loss in wages (ignoring fractions) of $48,447. Taking his average weekly wage as a basis, they present us with gross earnings over a period of expectancy of $64,521, in round figures. If the lower rate of earning be employed, based on 1952 wages, counsel show us that the present value of $48,447, invested at 3% will equal $31,086.80, some $6,000 less than the amount awarded by the verdict, leaving out of consideration any portion of the verdict allocated by the jury as compensation for pain and suffering.

The evidence disclosed the plaintiff was an illiterate alien from Mexico. He never attended school a day in his life. He neither understood nor could he read or write, the English language. This inability to read or write applies as well to his native tongue so far as the record indicates. It is true plaintiff's expectancy would produce the sums indicated, should he continue to earn throughout such expectancy at the same rate. It is to be remembered, however, that he was nearly 60 years of age, already infirm from the ravages of disease and prior injuries. He would be a superman should he prolong his earning period to the limit of his expectancy, almost carrying him to 75 years of age.

If the jury believed his story and that of his medical witnesses, however, his earning capacity was ended. An overall view of the testimony fails to satisfy us the trial court abused its discretion in denying defendant's motion for new trial, containing the first and only challenge to sufficiency of the evidence to sustain the verdict in any particular and complaining of the award of damages as excessive. Compare Turrietta v. Wyche, 54 N.M. 5, 212 P.2d

1041, 15 A.L.R.2d 407, and Thompson **v.** Anderman, 59 N.M. 400, 285 P.2d 507.

■ Having disposed of Point One, relied upon by the defendant, we are brought to an immediate consideration of Point Two urged by counsel as presenting reversible error on the part of the trial court. It reads:

"The court erred in refusing to admit into evidence for consideration of the jury plaintiff's Exhibit 7 to impeach the testimony of the witness, James Maria."

Two witnesses for the plaintiff appear to have done a "right about face" in testimony which each gave at the trial as contrasted with written statements given by them in question and answer form on April 13, 1953, a little more than three weeks following date of the accident to plaintiff on March 20, 1953. In addition, the witness James, known as "Jimmy", Maria, a Laguna Indian, had made a written statement in the office of defendant's superintendent on July 8, 1953. The joint statement, first above mentioned, in question and answer form, known as Defendant's Exhibit "6", was signed both by Tony Castillo and "Jimmy" Maria and was admitted in evidence by the court.

When we come to plaintiff's Exhibit 7, however, offered in evidence by defendant after same was exhibited to Maria on the stand and an admission secured from him that he signed same, a different ruling by the trial court was made. The action of the court may best be understood if we show the proceedings in connection with the offer of the statement, plaintiff's Exhibit 7. The following proceedings occurred, to-wit:

"Q. I will hand you a document marked Plaintiff's Exhibit 7. Look at it and see if that is your signature on that? A. Yes, Sir, that is my signature. This is allright—talking about my side is allright.

"Q. Just look at it and tell us if that is your signature? A. That is my signature, yes, Sir, to his talking. * * *

"Q. Is that your signature? A. Yes, Sir, that is my signature.

"Q. You signed both pages on that; is that your signature on both pages? A. Yes.

"Q. You read it before you signed it? A. Yes, Sir.

"Q. You read it before you signed it, is that right? A. That is right.

"Q. Are the statements contained in Plaintiff's Exhibit 7 I have shown you true to the best of your knowledge at the time you made the statement?

A. Yes, Sir.

"Q. We now offer Plaintiff's Exhibit 7 into evidence. * * *

"Mr. Chavez: Objected to on the grounds that it contains for the most part conclusions, which is what the Jury is to determine. * * *

"The Court: I will sustain the objection. There is no foundation laid. * * *

"Mr. Johnson: Exception.

"The Court: As I understand the state of the record, counsellor, this man signed his name to a paper which you offered. * * *

"Mr. Chavez: Exception."

At this point in the proceedings the trial court asked the witness a question and the proceedings continued, as follows:

"Mr. Johnson: You say that you signed this statement and that it was—bearing the date July 8, 1953, is that approximately the time it was taken? A. Who is that—(pointing to middle of page ....) This is the same one here * * * yes. * * *

"Q. I can't hear you. * * * A. That is the same one here. * * *

"Q. It was about July 8, 1953 as near as you can remember? A. Well, I can say is yes—because I can't think back that long.

"Q. On page 2 of this statement above your signature is the following: 'I hurt my ankle playing ball on March 22, 1953 and I was telling Mr. Lopez about it at work. He mentioned then that his foot was bothering him. He did not say anything to me about hurting his foot and he never said anything to me at any time while we worked together about injuring his foot while on duty. I had noticed Mr. Lopez limping some for some time before I told him about hurting my ankle'. * * * Now, what I have just read to you from your statement, is that true or not true? A. At that time when I put my signature, it is true I guess, because that is my signature there.

"Q. That is your signature there? A. Yes, Sir.

"Q. Is that true, what's there? A. That is right.

"Q. It is true? A. That is what I said.

"Q. And is it true? A. I guess so—I wrote it true.

"Q. As far as you know, you told the truth then? A. Right.

"Q. That is all."

Counsel for the defendant early in their argument under this claim of error quote 1953 Comp. § 20–2–1, reading:

"Upon the trial of any cause a witness may be cross-examined as to previous statements made by him in writing or reduced into writing, relative to the subject-matter of the cause without such writing being shown to him, but if it is intended to contradict the witness by the writing, his attention must, before such contradictory proof can be given, be called to those parts of the writing which are to be used for the purpose of so contradicting him."

Rather than aiding defendant, this statute and the decisions under it affirm the correctness of the trial court's ruling when the statement, Plaintiff's Exhibit 7, was offered in evidence. United States v. Fuller, 5 N.M., Gild., 80, 20 P. 175, and Kirchner v. Laughlin, 6 N.M. 300, 28 P. 505, 508. In United States v. Fuller, supra, the court ruled that an objection to an attempted impeachment of witnesses, by reading to them their testimony in writing, given at a former trial, that the testimony should have been read to the witnesses at the time of their interrogation, as a foundation for their impeachment, and not afterward, was properly sustained.

In Kirchner v. Laughlin, supra, the situation confronting the trial court was very much like the one in the record before us.

The same ground upon which the trial judge here justified his ruling denying admission of the writings, offered by way of impeachment, was upheld by the territorial Supreme Court under the statute cited, 1953 Comp. § 20–2–1 Compiled Laws 1884, § 2084. The court said:

"* * * On July 10, 1882, and on June 20, 1883, Breeden wrote to Laughlin two letters, wherein he in substance stated that his opinion as to Wiley's right to sign the sheep contract in Laughlin's name was based upon representations made to him by Wiley. While Mr. Laughlin was on the witness stand, his counsel offered these two letters for the purpose of contradicting the testimony of Col. Breeden. Plaintiff's counsel objected on the ground that they were inadmissible for the purpose, for the reason that the proper foundation had not been laid to warrant their reception under provisions of section 2084, Comp.Laws 1884. The objection was sustained. The ruling was correct. The section above cited, provides: 'But, if it is intended to contradict the witness by the writing, his attention must, before such contradictory proof can be given, be called to those parts of the writing which are to be used for the purpose of so contradicting him.' The rule would be the same in the absence of the statute, as declared by the English judges to the

house of lords in 1820, pending proceedings against Queen Caroline. 2 Brod. & B. 286-291."

It is to be noted that the objection interposed by counsel for plaintiff upon the offer by defendant of Plaintiff's Exhibit 7 was that it contained for the most part conclusions. However, the trial judge did not exclude the writing on that ground. In fact, he ignored the objection made and sustained his ruling on a ground interposed by him, namely, that a proper foundation had not been laid for admission of the writing.

We are compelled to agree with the ruling of the trial judge. A reading of the cross-examination of the witness sought to be impeached by statements in the writing will disclose that the extent of any effort to lay a foundation was somewhat meager. It did not go beyond having the witness admit he signed the writing after reading the same and that the statements therein were true to the best of his knowledge and belief at the time they were made. Attention of the witness was not called to the portions thereof intended to be used to contradict, or to impeach him.

The writing, signed on each of its two pages by the witness, was a somewhat lengthy document. It consisted of one and one-half typewritten pages, single-spaced. Some portions thereof were not of an impeaching character at all and, indeed, rather

tended to aid the plaintiff on the issue of negligence. Touching this offer as the record stood when it was made, we think it comes squarely within the ruling of the territorial court in Kirchner v. Laughlin, supra, and that here as there the ruling of the trial court must be sustained.

True enough, defendant's counsel continued to interrogate the witness, following the court's ruling denying it admission, and in the course of his cross-examination actually quoted a portion of the writing which was contradictory of testimony given at the trial. The witness admitted having made the statement quoted, and that it was true, as he then thought. The specific interrogation is brief and will be again quoted. It reads:

"Q. That is your signature there? A. Yes, sir.

"Q. Is that true what's there? A. That is right.

"Q. It is true? A. That is what I said.

"Q. And is it true? A. I guess so—I wrote it true. * * *

"Q. As far as you know, you told the truth then? A. Right.

"Q. That is all."

The writing as a whole, or piecemeal, was never again offered in evidence. If the portions thereof pointed out to the witness, about which he was cross-examined, repre-

sented what counsel deemed the most damaging portion for impeachment purposes, they got it before the jury in a more impressive fashion than by merely passing the writing to the jury, with all other portions deleted. And, if other portions were sought to be relied on they should have been pointed out to the witness in the cross-examination for such explanation, if any, he might care to make or offer. If he admitted making the statement there would, of course, be little purpose in introducing the writing itself, the contradictory statements having already been read to the jury.

At the trial the plaintiff was confronted by written statements by him and by two of his most material witnesses, contradicting the testimony of all in vital particulars. Poor explanations were offered for the statements contradicting their testimony. Indeed, as already indicated, the testimony was sharply conflicting throughout. The record thus presents a situation frequently encountered, one where more than any other, the judgment of a jury on the facts is peculiarly fitting. Truly, a verdict either way on the facts would not be lacking in substantial evidence to support it. So viewing the case and finding no error, the judgment will be affirmed.

It is so ordered.

COMPTON, C. J., and LUJAN, McGHEE, and KIKER, JJ., concur.