**Daisy BROWN, Plaintiff-Respondent,**

v.

**The KROGER COMPANY, a corporation, Defendant-Appellant.**

**No. 8022.**

Springfield Court of Appeals.

Missouri.

June 15, 1962.

ton was an old one, the bottom was discolored "like it had been wet," one side of the bottom came loose, and a bottle fell to the floor and broke. A piece of glass made a cut, about one inch long, on the shin of plaintiff's left leg. Further details of this occurrence will be found in Brown v. Kroger Co., Mo., 344 S.W.2d 80. After the occurrence the store manager took plaintiff across the street to a Dr. Turner, who cleansed the cut and put a band-aid over it. She returned to the doctor the next day and the process was repeated. Then she went to Michigan, stayed not to exceed two weeks, and returned home. The wound stayed sore, became inflamed, and caused her considerable pain. Some (from) ten days to four weeks after the incident of the cut, she went to her own physician. He found her suffering from phlebitis, an inflammation resulting in a swollen leg, and a sore or ulcer on the front of the leg. Her physician treated her and put a restrictive bandage on her leg which plaintiff wore for several weeks. During this period the condition was very painful and plaintiff sat with the leg propped in a chair a good part of the time and could not do her housework. She used crutches part of the time. In June 1958 the doctor operated on the leg and took two veins out of the front of the leg. Plaintiff remained in the hospital for one week. Her after-treatment consisted of the injection of a sclerosing agent in other veins in the front of the leg, ointments and a bandage. It was two weeks before she could get around, and after that she "just crippled around" for awhile. Thereafter her leg was painful around the cut place and sometimes burned and ached "all the way up to my hip." At time of trial she still wore a band-aid over the sore place. Her doctor testified that the ulcer or sore place would heal but that the damage from infection to the veins and lymphatic system in the leg would remain; that the calf and ankle of her left leg were one-half inch larger around than the right calf and leg; that in his opinion the condition, known commonly as milk-leg, would continue to be painful.

Henson & Henson, Poplar Bluff, for defendant-appellant.

Briney & Welborn, Joe Welborn, James E. Spain, Bloomfield, Byron Kearby, Poplar Bluff, for plaintiff-respondent.

RUARK, Presiding Judge.

This is an appeal from a judgment on a verdict of $12,500 in favor of plaintiff-respondent Daisy Brown, on account of the aggravation of a varicose vein condition.

On February 28, 1958, plaintiff, a housewife (age 44 years at time of trial on May 1, 1961), was shopping in defendant's supermarket. She undertook to take a six-pack carton of Pepsi-Cola from a low shelf and place it in her shopping cart. The car-

As to plaintiff's previous condition: In 1947 or 1948, following birth of a child some ten years before the incident here involved, plaintiff had developed a varicose vein condition which resulted in her being hospitalized, and the vein on the inside of her left leg, from groin to ankle, was removed. She testified that after about three weeks this gave her no more trouble.

In 1954, some four years before the incident here involved, a hammer had been knocked off a stepladder and in falling bumped the shin of her left leg. It did not break the skin, but plaintiff developed trouble with the leg, was hospitalized for three days, and was treated with heat. She says this condition "cleared up in just a few weeks." Her physician thereafter had warned her to be very careful with her leg and she knew that any blow or cut would "cause more trouble than if it was a normal healthy leg." Her physician in the 1954 incident was the same one who treated her in respect to the incident here involved. However, during his treatment of her, and in the removal of the two veins from the front of her leg, he did not discover, and did not know of, the fact that she had previously had a vein removed from the entire length of this leg in 1947 or 1948. She gave him no history of it.

Appellant's first contention is that plaintiff did not make a submissible case because (a) there was no evidence of negligence on the part of defendant, (b) there was no evidence of knowledge of a defective soda carton, (c) there was no proof that the container involved was defective, and (d) plaintiff was guilty of contributory negligence as a matter of law in permitting the cut to become infected.

■ As to (a), (b), and (c) above we think the question is foreclosed. In Brown v. Kroger Company, Mo., 344 S.W.2d 80,

the Supreme Court ruled on the submissibility. As nearly as we can tell, the decision was based on identical or almost identical evidence. We are not inclined to overrule the Supreme Court as to those matters so decided.

As to (d), defendant bases its claim upon the fact that plaintiff, having knowledge of her existing leg condition, went her usual way, in fact went to Michigan; that during the period of ten days to four weeks, until she went to her own physician, she bathed every day or two; that in so doing she would remove the band-aid over the cut and submerge this leg, along with the rest of herself, in water which contained soap and in which she also had added an antiseptic such as Lysol; and that after so bathing she would replace a band-aid over the cut. "That is what Dr. Turner told me to do." In response to a hypothetical question involving the submerging of the leg in soapy water, her personal physician (the one who treated her later) stated only, "I wouldn't treat it that way."

■ Although it is the duty of a person injured to use the care of a reasonably prudent person to mitigate and not aggravate his injuries,[1] the failure to attempt to mitigate will not bar the plaintiff entirely from recovery. It does not destroy the cause of action for injury. 25 C.J.S. Damages § 33, p. 502; Lokey v. Rudy-Patrick Seed Co., Mo.App., 285 S.W. 1028(12); Cline v. City of St. Joseph, Mo.App., 245 S.W.2d 695, 702. It would therefore seem that the subject is not a proper one to be considered on a demurrer type motion. But, acting upon the assumption that the defendant intended to contend that the damages sued for were not the proximate result of the wrong suffered, we will consider it.[2]

There is nothing in the evidence which shows that plaintiff's bathing caused the in-

1. Stipp v. Tsutomi Karasawa, Mo., 318 S.W.2d 172, 175; Phegley v. Graham, Mo., 215 S.W.2d 499, 505, 6 A.L.R.2d 382; King v. City of St. Louis, Mo.App., 155 S.W.2d 557.

2. See Croak v. Croak, Mo.App., 33 S.W. 2d 998, 1002; Thompson v. Healzer Cartage Co., Mo., 287 S.W.2d 791, 794; Murphy v. Southern Pac. Co., 31 Nev. 120, 101 P. 322, 328.

fection. The nearest approach to it is the answer of the physician that "I wouldn't have treated it that way." On the other hand, in doing what she did she was following the advice of the physician to whom she was taken by defendant's store manager.[3]

From time to time, probably ever since prehistoric man first waded into the river and had his leg nibbled by an ancestor of the crocodile, there has been controversy as to whether bathing is unhealthful. Some students have argued that a contributing cause to the decline and fall of Rome was that leading citizens spent too much time luxuriating in debilitating baths. In at least one American colony, frequent bathing was considered not only unhealthful but slightly immoral. There is today a rather large segment of the population, composed mostly of busy boys, which holds to the belief that bathing, if not unhealthful, is at least inconvenient. We refuse to enter into the dispute further than to say this court does not intend to hold a lady guilty of contributory negligence as a matter of law because she takes a bath every day or two.

Error is assigned because of refusal to strike the testimony of the witness Umfleet, an employee of the store who witnessed the occurrence and later examined the cardboard carton, that a part of such carton "was discolored, like it had been wet," because such testimony was a conclusion which invaded the province of the jury. Although reference to this testimony was made in Brown v. Kroger Co., supra, Mo., 344 S.W.2d 80, there is no indication that objection had been made or that the point was raised.

Where the facts or premises upon which a conclusion is based can be fairly stated, then the conclusions of a nonexpert witness are not admissible, for the facts themselves can be put in front of the jury. But when it is impossible or extremely difficult for a witness to convey an accurate and actual meaning, and the nature of the thing described may be more clearly and practically conveyed to the jury by a summary of the witness's impressions, or by comparison with some ordinary object or condition familiar to the court or jury, then the practical administration of justice requires acceptance of the testimony even though it may be, in a sense, the conclusion of the witness.[4]

It can well be argued that practically all so-called statements of fact are in reality the conclusions of the speaker based on the sum total of his impressions in regard to any certain object of discussion, concerning which the various and minute impressions that result in the conclusion cannot readily be communicated, in fact may not be separately recognized or realized by the witness. The practical application of the rule against conclusions is simply a matter of degree. Just how else *would* a witness, or the reader, for that matter, in intelligible language of 100 words or less, describe the condition as accurately as did the witness without using the word *wet* or its equivalent? We hold the ruling was not error.

The court overruled defendant's objections to the introduction of the deposition of Max Merriman, the store manager, in regard to previous occurrences and conditions at the store. The deposition did not purport to cover any phase of the incident in which the plaintiff received her injury. It is contended that since the witness was

3. See Hughes v. Maryland Casualty Co., 229 Mo.App. 472, 76 S.W.2d 1101, 1103; Smith v. Kansas City Rys. Co., 208 Mo. App. 139, 232 S.W. 261, 263; Scholl v. Grayson, 147 Mo.App. 652, 127 S.W. 415, 417.

4. Brawley v. Esterly, Mo., 267 S.W.2d 655, 662; Schmidt v. Pitluck, Mo.App., 26 S.W.2d 859(8); Kirchof v. United Rys. Co. of St. Louis, 155 Mo.App. 70, 135 S.W. 98, 101; Merritt v. Kinloch Telephone Co., 215 Mo. 299, 115 S.W. 19, 22; Godfrey v. Kansas City Light & Power Co., 299 Mo. 472, 253 S.W. 233, 237; Griffith v. Continental Casualty Co., 299 Mo. 426, 253 S.W. 1043, 1047; Kennedy v. Union Electric Co. of Missouri, 358 Mo. 504, 216 S.W.2d 756, 761.

not a party and was present and available to testify, the deposition should not have been admitted. This contention was raised in the former case (Brown v. Kroger Co., supra, Mo., 344 S.W.2d 80). And the Supreme Court, taking note of the fact that there was no objection on the ground that part of the proffered statements did not tend to show knowledge on the part of defendant but tended to prove negligence, limited its ruling to the question of whether the deposition statements tended to show notice or knowledge. *This* time the defendant objected because "the testimony offered goes beyond that testimony required to show notice, and is by the plaintiff an attempt to prove negligence by hearsay testimony * * *." It did not specify what part or portion of the deposition was objectionable for the reason given.

■■ Here again, as was remarked in the previous case, "Defendant did not at the trial and does not in its brief point out wherein the parts of the store manager's deposition read in evidence 'included testimony on the issue of negligence.' It is not apparent to us that any of the admitted statements did not pertain to matters tending to show knowledge on the part of the defendant through its store manager." Nor are we able to say from reading the several pages of the deposition that any portion of it does not bear on the question of notice or knowledge. "It is elementary that evidence that is relevant and material for one purpose cannot be excluded solely because it might be inadmissible for some other purpose." Houfburg v. Kansas City Stock Yards Co. of Maine, Mo., 283 S.W. 2d 539, 549; Louis Steinbaum Real Estate Co. v. Maltz, Mo., 247 S.W.2d 652, 656, 31 A.L.R.2d 1052. The defendant made no request for a limiting instruction,[5] and we do not find that the evidence was improperly or unfairly used. The contention of error is overruled.

In the argument plaintiff's counsel stated, " * * * the manager of Kroger's told you in this deposition, they had had previous accidents of the same kind, and within the space of a year, on three occasions where the cartons—" Here appellant interposed an objection to reference to three occasions. Respondent's counsel apologized and said he meant to say two occasions or "one and possibly two." Defendant's objection was sustained. The court stated, "The testimony was by their manager, by deposition, that it had one previous accident where a Pepsi-Cola or some sort of soft drink had fallen through the bottom of a carton, and possibly two." Thereupon defendant moved to discharge the jury and declare a mistrial. Appellant complains because "the statement of the court was not an exact quotation of the evidence, placed special emphasis on the testimony, and amounted to a comment upon the evidence by the court."

■ The statement of the court appears to have been directed to the lawyers in explanation of the ruling. It was a fair and accurate summary of the evidence which was the basis of the objection. It did not emphasize or minimize the importance of such evidence, nor did it indicate that more or less weight should be given it than to any other evidence. We are convinced there was no error in the court's conduct in this respect, and that, had it been error, it was harmless.[6]

At the close of the evidence the jury was handed forms of verdict for plaintiff and for defendant, these on one sheet of paper, and given the usual instruction as to method of signing and returning the verdict. Subsequently they returned the paper. At the top was a plaintiff's verdict signed by the foreman. At the bottom of the sheet, at the left-hand side, presumably under the blank defendant's verdict, eight other jurors had signed.

5. See Martin v. Mercantile Trust Co., Mo., 293 S.W.2d 319, 329; Grimm v. Gargis, Mo., 303 S.W.2d 43, 51, 74 A.L.R.2d 599.

6. Heier v. Funsch, Mo.App., 61 S.W.2d 253, 255–256; Chervek v. St. Louis Public Service Co., Mo.App., 173 S.W.2d 599, 605.

"The Court: Mr. Whitlow, I am directing my inquiry to you as foreman. Was the verdict of the jury, as finally arrived at, a unanimous verdict?

"Mr. Whitlow: No.

"The Court: How did you stand numerically, without saying whether you were for the Plaintiff or the Defendant, that is, were you six and six or eight to four or nine to three?

"Mr. Whitlow: Nine and three.

\*　\*　\*　\*　\*　\*

"The Court: Did the nine intend to return a verdict for the Plaintiff or the Defendant?

"Mr. Whitlow: For the Plaintiff."

Thereupon the court prepared new forms of verdict, this time on separate sheets, and again instructed the jury that if all agreed the foreman would sign; that if all did not agree, nine or more could return a verdict. But in that event all those who did agree should sign. Some four minutes later the jury returned with a verdict for plaintiff signed by the foreman.

"The Court: (To counsel, after reading the verdict) Do either of you want to poll the Jury and ask any questions?"

Counsel on both sides answered, "No, sir."

"The Court: Is that the verdict of you all?

"The Jury: (General assent) Yes, sir."

Thereupon the verdict was received.

Appellant contends that its objections to resubmitting the verdict on separate sheets, and its motion for a mistrial, should have been sustained.

 We think the action of the court was proper. Whenever a verdict is returned by a jury it should be examined by the court, and if it is found to be ambiguous, inconsistent, or otherwise defective, the attention of the jury should be called to it and opportunity offered to correct the error before such verdict is finally received and recorded.[7] In this instance it is obvious that the eight concurring jurors were simply mistaken in signing at the bottom of the page. The final verdict was assented to by all the jury; and counsel, although afforded the opportunity, did not request that the jurors be polled. This, then, became the verdict which was received and recorded.

The final assignment is that the verdict is excessive, and that the damages are so grossly excessive as to indicate passion and prejudice.

 There are two kinds of excessive verdicts. (a) One is that in which the jury made an honest mistake and allowed a disproportionate sum. Such mistake can be cured by ordering a remittitur of a portion of the sum allowed. (b) The other is a verdict so grossly excessive as to indicate bias and prejudice, in which the jury was guilty of misconduct in fixing an excessive figure, usually as a result of prejudice engendered during the course of the trial. This requires that the verdict be vitiated and a new trial be ordered. Skadal v. Brown, Mo., 351 S.W.2d 684, 689–690; Jones v. Pennsylvania R. Co., 353 Mo. 163, 182 S.W.2d 157, 159; Weber v. St. Louis Public Service Co., Mo.App., 232 S.W.2d 209, 211; Parks v. Thompson, 363 Mo. 791, 253 S.W.2d 796, 798–799. Appellate courts do not possess the wide latitude of discretion of trial courts, and they do not ordinarily infer bias and prejudice simply because of the size of the verdict. We do not find in the record anything likely to have engendered bias or prejudice, or any-

---

7. Blackman v. Botsch, Mo.App., 281 S.W. 2d 532, 535; Kaimann v. Kaimann Bros., Mo.App., 182 S.W.2d 458, 462; Riley v. St. Louis Public Service Co., Mo.App., 245 S.W.2d 666, 672; Singleton v. Kansas City Baseball & Exhibition Co., 172 Mo.App. 299, 157 S.W. 964, 966; Turley v. National Ammonia Co., Mo.App., 299 S.W. 53, 55.

thing to indicate that the jury did not faithfully and honestly discharge its duty to the best of the ability of its members. We see no basis for the claim of a verdict so grossly excessive as to show bias and prejudice so as to require the ordering of a new trial. We are, however, concerned with the question of whether the verdict was simply excessive.

There is no precise rule by which we may determine whether a verdict is excessive. Each case must be decided on its own facts, due regard being given to the purchasing power of the dollar and the rule of reasonable uniformity, with consideration being given to the better position of the jury and the trial judge to measure the damages.[8] The plaintiff of course is entitled to recover for the aggravation of her leg condition, but she is not entitled to recover damages for those conditions which existed before her injury, or conditions not the direct and proximate result of defendant's negligence. Widener v. St. Louis Public Service Co., 360 Mo. 761, 230 S.W.2d 698, 701; Thompson v. Healzer Cartage Co., Mo., 287 S.W. 2d 791, 794; Belisle v. Wilson, Mo., 313 S.W.2d 11, 18.

A hypothetical question asked of plaintiff's physician assumed the previous varicose condition and

"Now, Doctor, do you have an opinion * * * as to whether or not the cut that she received in February, February 28, 1958, caused the condition of her leg as it was when you last saw her on April 29, 1961?

"A. It is my opinion that this woman suffered an inflammation of her left leg as a result of a wound which was incurred on the anterior aspect of her left leg."

But in response to a question on cross-examination he stated that the condition of her leg as it existed at trial time was "a condition whereby the vein had been cut, according to what the history was, by a piece of glass, resulting in an inflammation of this leg, of the left leg, and of the veins and lymphatic system of the left leg." He testified, however, that once a person has developed a varicose vein condition, that condition will stay with such person until death; that a varicose vein condition, in and of itself, depending upon its severity and the activity of the person, is painful. Thus it would seem that although plaintiff's condition was aggravated, she was already subject to a condition liable to be restrictive or painful.

In Walker v. St. Louis Public Service Co., 362 Mo. 648, 243 S.W.2d 92, an aggravated permanent and progressive heart condition of a woman 36 or 37 years old resulted in a verdict for $14,000. It was held excessive by $4,000.

In Weber v. St. Louis Public Service Co., Mo.App., 232 S.W.2d 209, the woman suffered an aggravation of pre-existing phlebitis plus a painful neck. There was medical expense of $100, inability to work for seven months, and thereafter reduction in wages she was able to earn. The swelling continued. *The trial court* reduced a verdict from $12,920 to $4,920, and this was affirmed.

In Glaves v. Old Gem Catering Co., Mo. App., 18 S.W.2d 564, 568, a 43-year-old waitress suffered a condition resulting in an open sore, swelling and pain, a wage loss of $2,000, medical expense of $250, and a reduction in earning capacity. The court said that an award of $7,500 was "a most substantial one," but not so large as to indicate passion and prejudice.[9]

---

8. Burr v. Kansas City Public Service Co., 365 Mo. 115, 276 S.W.2d 120, 127; Cline v. City of St. Joseph, Mo.App., 245 S.W. 2d 695, 702–703; Wofford v. St. Louis Public Service Co., Mo., 252 S.W.2d 529, 534.

9. Other cases on aggravation of varicose vein condition are Pembor v. Marcus, 307 Mich. 279, 11 N.W.2d 889, (with other damages) $5,000-plus for personal injuries, remittitur of $2,500 required; Davis v. Gibbs, 23 N.J.Super. 558, 93

Bearing in mind that plaintiff's pre-existing condition was permanent and likely to be painful if plaintiff is active, and that there was no wage loss, but also considering that the purchasing power of the dollar has declined, we have concluded that the verdict is excessive by at least $3,500. We therefore affirm the judgment subject to the condition that plaintiff will, within 15 days, file remittitur in the sum of $3,500; and if said remittitur be not filed, the judgment is reversed and remanded for new trial on the issue of damages.

McDOWELL, J., concurs.

STONE, J., dissents in separate opinion.

STONE, Judge.

Viewing the evidence in the light most favorable to plaintiff and the verdict [Grimm v. Gargis, Mo., 303 S.W.2d 43, 52–53(16), 74 A.L.R.2d 599; Horrell v. St. Louis Public Service Co., Mo., 277 S.W.2d 612, 618(12)], and having due regard for the important considerations bearing upon the question as to whether the verdict was excessive [Kiger v. Terminal R. Ass'n of St. Louis, Mo., 311 S.W.2d 5, 15(19); Rodefeld v. St. Louis Public Service Co., Mo., 275 S.W.2d 256, 262(11, 12)], examination of many cases dealing with this problem (notwithstanding that no two cases are poured in the same factual mold) impels the conclusion on my part that, even in this period of easy money and continuing inflation, the verdict was grossly excessive and, with respect for the rule of reasonable uniformity of awards for similar injuries and disabilities, a judgment for more than $7,500 cànnot be justified and should not be permitted to stand. Agreeing with the holding in the principal opinion that nothing indicates misconduct by the jury in assessing damages in an excessive amount as a result of bias and prej-

udice [Skadal v. Brown, Mo., 351 S.W.2d 684, 690(14)] and thus that the mistake in returning an excessive verdict can be cured and corrected without a new trial, I would require, as a condition to affirmance, a remittitur in the sum of $5,000. For that reason alone, I dissent.

A.2d 206, $5,000 held excessive and new trial ordered; Mire v. St. Paul Mercury Indemnity Co., La.App., 103 So.2d 553, $10,645 remitted to $6,645; Lopez v. At-

chison, T. & S. F. Ry. Co., 60 N.M. 134, 288 P.2d 678, (total inability to work) $25,000 not so excessive as to require a new trial.